FEDERAL TRADE COMMISSION,
Plaintiff–Appellee,

v.

FIGGIE INTERNATIONAL, INC.,
Defendant–Appellant.

No. 91–55367.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 7, 1992.

Decided May 7, 1993.

---

18. *See California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611,

30 L.Ed.2d 642 (1972).

Jack R. White, Hill, Farrer & Burrill, Los Angeles, CA, for defendant-appellant.

David Shonka, Office of Gen. Counsel, F.T.C., Washington, DC, for plaintiff-appellee.

Before: FLETCHER, O'SCANNLAIN, and KLEINFELD, Circuit Judges.

PER CURIAM:

Pursuant to Section 5 of the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45, Figgie International, Inc. ("Figgie") was ordered to cease and desist from the "unfair or deceptive" practices it used to market its Vanguard heat detectors. After the order became final, FTC sought consumer redress under section 19 of the FTC Act, 15 U.S.C. § 57b. The district court granted FTC's motions for summary judgment, finding Figgie liable for "dishonest or fraudulent" practices in its first judgment and setting the amount of liability at a minimum of $7.59 million and a maximum of $49.95 million (i.e. a range between the amount of Figgie's profits and the full amount spent by consumers) in the second. Figgie appeals both. We affirm as modified.

## FACTS

In a Section 19 proceeding, the Commission's findings of material fact in support of its cease and desist order "shall be conclusive." Section 19(c)(1), 15 U.S.C. § 57b(c)(1). Administrative Law Judge Montgomery K. Hyun issued extensive findings on October 23, 1984 ("ALJ") which were adopted in the Commission's final order on April 11, 1986 ("Comm'n"). *Figgie International, Inc.*, 107 FTC 313 (1986), *aff'd*, 817 F.2d 102 (4th Cir.1987) (text in Westlaw). We summarize the findings.

Figgie manufactures and markets heat detectors for home use under the brand name "Vanguard." Unlike smoke detectors, heat detectors are mechanically operated devices requiring no electricity. Each comes equipped with a fuse which melts at a specified temperature: when the fuse melts, the spring-wound alarm sounds. Until the 1970's heat alarms were considered efficacious. Thereafter fire safety experts modified their views and recommended smoke detectors over heat detectors as the preferred safety device for most locations, recognizing that there were several problems with heat detectors as a household fire alarm system. First, most fire fatalities are caused by asphyxia-

tion or smoke inhalation, not burns. ALJ ¶ 100–04. Smoke is therefore the hazard most in need of detection. Second, smoke from a residential fire will disperse fairly evenly around a room, allowing it to be quickly detected. Heat distributes less evenly, so that a detector not placed directly over a fire may be slow to activate. ALJ ¶ 182. Therefore, detectable quantities of smoke precede detectable levels of heat in nearly all residential fires. ALJ ¶ 101. Third, heat detectors are subject to "thermal lag," which means that the fuse will usually not reach its melting point until after the air surrounding it has become much hotter. ALJ ¶ 113–16.

These limitations were demonstrated in a series of test fires conducted by fire-prevention experts in the mid–1970's. In almost all test fires, heat detectors sounded their alarms several minutes later than smoke detectors did. Furthermore, heat detectors usually did not sound until after "tenability limits" (levels of smoke, fumes, heat or other hazardous conditions making escape difficult) had been reached. For example, in the "Indiana Dunes I" tests, thermocouple-style heat detectors did not sound at all in 14 out of 37 test fires. On average, the heat detectors sounded 2.2 minutes after tenability limits had been reached, whereas smoke detectors on average sounded 18.6 minutes beforehand. ALJ ¶ 133. The "Indiana Dunes II" tests used Vanguard heat detectors supplied by Figgie; their reaction time was "considerably slower" than the thermocouples. ALJ ¶ 135. In the "Cal Chiefs" test, in only 8% of the fires did a heat detector sound before tenability limits were reached, and in only 4% did the heat detector provide two or more minutes warning. ALJ ¶ 147.

The Vanguard heat detector first came on the market in 1959. For many years, the National Fire Prevention Association recommended both smoke and heat detectors as part of a household fire warning system. However, following the tests just described,

the NFPA changed its standards. The standard adopted in 1978 required at a minimum that smoke detectors be installed on each level of the home and outside each sleeping area. ALJ ¶ 172. The only mention of heat detectors was in the following footnote:

> The provisions of 2–1.1.1 represent the minimum number of detectors required by this standard. It is recommended that the householder consider the use of additional smoke or heat detectors for increased protection for those areas separated by a door from the areas protected by the required smoke detectors under 2–1.1.1 above.... However, the use of additional detectors remains the option of the householder.

ALJ ¶ 174.

Figgie knew of the results of the Indiana Dunes and Cal Chiefs tests and knew of the changes in the NFPA standards. However, its representations [1] to consumers during the 1980's did not reflect them. The crux of Figgie's message was that heat detectors could be relied on as life-saving fire warning devices, and that the best protection for one's home is a combination of four or five heat detectors to one smoke detector. The ALJ's decision provides a thorough description of Figgie's promotional materials. ALJ ¶ 35–65. He concluded that "every one of them clearly conveys" the claim that Vanguard heat detectors provide the necessary warning to allow safe escape from a residential fire. ALJ ¶ 76. Similarly, "Virtually all of the promotional materials ... contain express and implied claims that the combination system combining Vanguard heat and smoke detectors significantly increase the level of fire warning protection than smoke detectors alone." ALJ ¶ 78. For example, one of Figgie's promotional pieces was styled as a "red-letter news release bulletin" with the headline "HEAT DETECTORS HAVE PROBABLY SAVED MORE LIVES AND PROPERTY THAN ANY OTHER FIRE DETECTION DEVICE." ALJ ¶ 50. Figgie's slide-

---

1. Figgie sold its Vanguard brand heat detectors (which it manufactured) and smoke detectors (which it purchased from another manufacturer) to distributors who then sold to the public. However, Figgie exercised "substantial control" over the way Vanguard heat detectors were marketed, "including the content of the sales presen-

tation." ALJ ¶ 21. Figgie prepared the slide-tape show that was the centerpiece of each sales pitch, as well as brochures, pamphlets and other sales paraphernalia. Figgie trained its distributors and encouraged them to conform their practices to its two-volume sales manual. ALJ ¶ 25–27.

tape show included a testimonial from a customer who said, "to have adequate protection the home must have heat detectors as well as smoke detector[s]." ALJ ¶ 40. One of Figgie's brochures discusses the NFPA standards "in such a way as to leave the reader with a distinct impression that [the NFPA] regards both smoke detectors and heat detectors equally effective." ALJ ¶ 82.

Figgie sold its products to the public through at-home sales visits by distributors. This sales technique "heightened the impact of the materials because the captive consumer's attention is focussed for the duration of the sales presentation." ALJ ¶ 84. In addition to the slide-tape shows, a sales presentation would often include a demonstration using a cardboard house with a tissue paper roof. The salesperson would place a lit candle inside the house while holding a heat detector directly over the tissue. The heat detector would alarm before the paper scorched. ALJ ¶ 62. This dramatic and seemingly informative demonstration was in fact misleading. The cardboard house channelled hot air from the candle directly to the fuse, a situation that would be "completely fortuitous" under actual fire conditions. Also, given that the ignition temperature of paper is 450, the demonstration proved only that a heat detector held inches above a flame will activate sometime before the fuse reaches 450. ALJ ¶ 183. Other forms of sales pressure could also be exerted in the home. Customers who bought less than the recommended number of the more expensive heat detectors were asked to sign a release acknowledging that only "partial fire detection protection" had been purchased. ALJ ¶ 65. Figgie's promotional techniques were very successful: its customers bought four or five heat detectors for every smoke detector. ALJ ¶ 18.

The ALJ concluded that Figgie's representations were misleading and deceptive in the absence of an explanation of the limits of heat detectors and the comparative superiority of smoke detectors. ALJ ¶ 187–88. The ALJ issued an order requiring that Figgie make appropriate disclosures to its customers and avoid all misrepresentations. Specifically, all promotional materials for heat detectors were required to carry the following notice: "CAUTION: In most residential fires dangerous levels of smoke, heat and carbon monoxide gas will build up before the heat detector alarm goes off."

On appeal, the Commission upheld most of the ALJ's findings and conclusions, but the warning message was changed to read as follows: "NOTICE: Smoke detectors give earlier warning than heat detectors in nearly all residential fires. That is because detectable amounts of smoke almost always develop before detectable levels of heat." The Commission explained that "the fact that smoke detectors almost always provide earlier warning than heat detectors would seem to be the single most useful piece of information that could be provided to potential purchasers of residential fire protection systems." Comm'n at 395.

The balance of the Commission's cease and desist order closely tracked the ALJ's order. Figgie may not represent directly or by implication "that heat detectors provide the necessary warning to allow safe escape from most residential fires" or "that fire alarm systems combining heat detectors and smoke detectors provide significantly greater fire warning protection than smoke detectors alone because heat detectors give earlier warning of hot flaming fires." *Id.* at 400. Figgie may not misrepresent "the capability of the heat detector to provide the necessary warning to occupants to allow them to escape safely in the event of fire." *Id.* Figgie's future representations must "rel[y] upon competent and reliable scientific evidence which substantiates such representation." *Id.* Figgie must send warning notices to all identifiable past purchasers of Vanguard heat detectors. *Id.* at 401. Figgie must not continue to do business with distributors who do not conform their practices to the order. *Id.*

The ALJ and the Commission carefully refrained from finding that the sale of heat detectors was in itself a deceptive trade practice. Both acknowledged that heat detectors, when added to the necessary minimum of smoke detectors, could provide additional protection for two reasons. First, smoke detectors may be prone to false alarms when

placed in kitchens, garages, furnace rooms or other areas where occasional smoke is to be expected. Second, batteries in smoke detectors wear out and the electronics within the smoke detector can become dirty or damaged. Mechanical heat detectors require no electricity and are virtually maintenance-free. "Obviously, an operating heat detector provides greater protection than a nonoperating smoke detector." Comm'n at 391. The ALJ concluded that a combined system of smoke and heat detectors, when added to the minimum number of smoke detectors, "can provide increased protection in residential fires." ALJ ¶ 186. The Commission found that while this incremental increase in protection was "marginal at best,"

> [t]hat is not to say, however, that a slightly better level of fire protection is not significant. As used in the complaint, "significant" simply means "important" or "meaningful." Whether a slightly better level of protection is significant may depend on the seriousness of the harm that could result if the protective device failed to operate. Even a very small amount of additional protection from death or serious injury caused by fire would no doubt be considered significant by some customers.

Comm'n at 389.

The Commission's cease and desist order was upheld on appeal. *Figgie Int'l, Inc. v. FTC*, 817 F.2d 102 (4th Cir.1987) (text in Westlaw). FTC then brought the current suit for consumer redress under Section 19 for the period between May 18, 1980 and July 20, 1987. On June 13, 1989, the district court granted FTC's motion to deem "conclusive" a list of 42 findings of fact distilled from the Section 5 proceeding. On February 9, 1990, the district court concluded that

> A reasonable man under the circumstances would have known that Figgie's representations that a) Vanguard heat detectors provide the necessary warning to allow safe escape in most residential fires, and b) a combined system of heat detectors and smoke detectors provides significantly greater warning than smoke detectors alone because heat detectors give earlier warning of hot, flaming fires were dishonest or fraudulent.

Summary judgment was therefore granted to FTC on the issue of liability.

On January 14, 1991, the district court granted summary judgment on the amount of redress. The court found that Figgie received $7.59 million in gross revenues from sale of Vanguard heat detectors between the relevant dates, and that consumers paid $49.95 million for them (293,824 units @ $170). The court further concluded that "The Vanguard heat detector's value, given the misrepresentations recommended by Figgie and made by distributors to consumers, is de minimis." Therefore, the court ordered that Figgie pay $7.59 million into a fund which would refund the full purchase price of Vanguard heat detectors to customers. If aggrieved customers claim less than that amount, the balance is to be used for "indirect redress" in the form of corrective advertising or donations to non-profit fire safety organizations. If customers claim more, Figgie is to continue to add to the fund as necessary, to a maximum of $49.95 million.

Figgie timely appeals both summary judgment orders.

## JURISDICTION

The district court had jurisdiction under Section 19(a)(2) of the FTC Act, 15 U.S.C. § 57b(a)(2), which allows the Commission to bring a civil suit for redress in any district court with personal jurisdiction over the defendant. Although Figgie's headquarters are in Virginia, it does business in the central district of California. Venue is therefore proper.

Pursuant to 28 U.S.C. § 1291 this court has jurisdiction over the district court's final orders granting summary judgment.

## DISCUSSION

### I. LIABILITY

Section 19(a)(2) of the FTC Act grants the Commission authority to bring a civil suit against any entity which engaged

> in any unfair or deceptive act or practice ... with respect to which the Commission has issued a final cease and desist order. If the Commission satisfies the court that

the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent, the court may grant relief[.]

15 U.S.C. § 57b(a)(2). The cease and desist order, affirmed by the Fourth Circuit, is final. Figgie mounts three challenges to the district court's judgment of liability based on its finding that a reasonable person would have known the act or practice was dishonest and fraudulent under the circumstances. (1) The district court erred in its characterization of the Commission's factual findings. (2) There was no evidence that Figgie had specific intent to defraud. (3) A reasonable person would not know that Figgie's practices were dishonest or fraudulent.

### A. Factual Findings

The district court granted summary judgment to the FTC on liability and damages. There has been no trial. We must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact. *Federal Deposit Ins. Corp. v. O'Melveny & Meyers*, 969 F.2d 744, 747 (9th Cir.1992). Since its cease and desist order became final, *Figgie Int'l, Inc. v. FTC*, 817 F.2d 102 (4th Cir.1987), the findings of the Commission are conclusive. 15 U.S.C. § 57b(c)(1). The Commission made findings independently, and adopted the administrative law judge's decision as its findings and conclusions except where inconsistent with its opinion, *In re Figgie International, Inc.*, 107 FTC 313, 399 (1986). The Commission's findings, and those of the administrative law judge which the Commission adopted, are accordingly treated as established facts for purposes of this decision.

■ We review the district court's grant of summary judgment de novo. *Intel Corp. v. Hartford Accident and Indemnity Co.*, 952 F.2d 1551, 1556 (9th Cir.1991). The district judge labelled a part of his decision "findings of fact." These were paraphrased from some of the findings of the Commission. Since there was no trial, and no other evidentiary hearing in district court in which findings might be made, the district court's determi-

nations were facts which the district court determined were material and not genuinely at issue. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *O'Melveny & Meyers*, 969 F.2d at 747; *cf.* Fed.R.Civ.P. 56(d). To the extent that the district court findings which paraphrase the Commission's findings, are claimed to deviate from the Commission's findings, the Commission's findings control, so we need not resolve appellant's claim that the district court did not paraphrase them correctly and accurately.

Accordingly, our review treats as facts those established by the Commission's findings. To the extent that the Commission adopted the ALJ's findings, we treat those as conclusive as well. Where the district court made findings based upon the affidavits and other materials submitted on summary judgment, we treat them as determinations that, as to those matters, no genuine issue of material fact was established. We view the evidentiary submission in the light most favorable to the non-moving party to determine whether genuine issues of fact remain for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510; *O'Melveny & Meyers*, 969 F.2d at 747.

■ Figgie also mounts two fact-based challenges to the district court's conclusions of law. First, Figgie insists that the only misrepresentations that could form the basis of liability are the two that appeared in the district court's conclusions of law: misrepresentations to the effect that (a) Vanguard heat detectors provide the necessary warning to allow safe escape in most residential fires, and (b) a combined system of heat detectors and smoke detectors provides significantly greater warning than smoke detectors alone because heat detectors give earlier warning of hot, flaming fires. This is not so. Section 19 premises liability on unfair or deceptive practices that are the subject of a cease and desist order. The Commission's final order encompasses far more than these two statements.

■ Second, Figgie engages in a tortured analysis to suggest that it never made the

"hot, flaming fires" statement, but that the Commission constructed it out of bits and pieces of separate promotional materials that were simultaneously in use for only six months. Despite Figgie's protestations to the contrary, this is an impermissible attempt to relitigate the Commission's conclusive findings. The Commission found that Figgie made the claim. Comm'n at 392. Section 19 prohibits the court from looking behind this finding.

### B. Specific Intent

The Federal Trade Commission has two powers relevant to this case, to deal with deceptive trade practices. If satisfied that a firm has been or is using a deceptive practice affecting commerce, the FTC may, after satisfying procedural requirements, order it to cease and desist from the violation. 15 U.S.C. § 45(b). In addition, under 15 U.S.C. § 57b(a)(2),

> If any person, partnership, or corporation engages in any unfair or deceptive act or practice (within the meaning of section 45(a)(1) of this title) with respect to which the Commission has issued a final cease and desist order which is applicable to such person, partnership, or corporation, then the Commission may commence a civil action against such person, partnership, or corporation in a United States district court or in any court of competent jurisdiction of a State. If the Commission satisfies the court that the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent, the court may grant relief under subsection (b) of this section.

15 U.S.C. § 57b(a)(2).

The case before us involves only the redress remedy, not the cease and desist remedy. The latter affects only future conduct. The redress remedy relates to past conduct and requires proof of the extra element that a reasonable person would have known under the circumstances that the practice was dishonest or fraudulent. In this case liability for past conduct would be imposed on Figgie if a reasonable person would have known in the circumstances that it was dishonest or

fraudulent for Figgie to use the practices it did to sell heat detectors.

■ Figgie would have us construe "reasonable person would have known" to require actual knowledge. Although Figgie's argument finds some support in *FTC v. AMREP Corp.*, 705 F.Supp. 119, 127 (S.D.N.Y.1988), that court's construction does not fit the words and grammar of the statute. Congress unambiguously referred the district court to the state of mind of a hypothetical reasonable person, not the knowledge of the defendant. The standard is objective, not subjective. That Figgie's Vice President–Marketing was innocent of any dishonest intentions, as his declarations establish for purposes of summary judgment, may be probative as to whether a reasonable person would also have been innocent of such intentions, but the issue of law is what a reasonable person would have known, not what Figgie's executive knew. The statute is unambiguous.

### C. Dishonest or Fraudulent Practices

■ Figgie correctly argues that the Commission's findings describing an "unfair or deceptive" trade practice under Section 5 do not necessarily describe a "dishonest or fraudulent" one under Section 19. Section 19 liability must not be a rubber stamp of Section 5 liability. Figgie appears to argue, however, that the Commission's findings alone can never be the basis of Section 19 liability. We disagree. When the findings of the Commission in respect to the defendant's practices are such that a reasonable person would know that the defendant's practices were dishonest or fraudulent, the district need not engage in further fact finding other than to make the ultimate determination that a reasonable person would know. This is such a case.

■ Figgie sold its product to the public on the basis of misrepresentations as to its effectiveness as a fire safety device. Specifically, Figgie misled customers about "the single most useful piece of information" they could have used: that smoke detectors provide earlier warnings for almost all residential fires. Comm'n at 395. Further, it failed

to warn that in most instances the warning from heat detectors would come too late to save lives. There is ample evidence in the Commission's findings to satisfy a court that a reasonable person with Figgie's access to the scientific data establishing the relative inferiority of heat detectors would have known that Figgie's vigorous misrepresentations on their behalf were dishonest and fraudulent.

The fact that heat detectors have some value does not alter this conclusion. Figgie's liability under Section 19 is premised not on the fact that Figgie sold heat detectors, but on the dishonest or fraudulent practices it used to sell them. The sales practices were the object of the cease and desist order. From the outset of the Section 5 proceeding, the Commission's concern was with whether "promotional materials supplied to and used by Figgie distributors during in-home sales presentations contain express and implied effectiveness claims for Vanguard heat detectors which are deceptive and unfair." ALJ at 315. By way of analogy, there is nothing dishonest about selling rhinestone jewelry; it has some value. However, it is dishonest to represent that rhinestone jewelry is actually diamond, and to charge diamond prices for it. A district court may properly find that a rhinestone merchant who engages in such practices has behaved in a way that a reasonable person in the circumstances would have known was dishonest or fraudulent.

█ Figgie frequently argues that some of the representations that the Commission found false or misleading were implied, not express. This is a distinction without a difference. Figgie can point to nothing in statute or case law which protects from liability those who merely imply their deceptive claims; there is no such loophole.

Figgie argues that a reasonable person could conclude that Vanguard heat detectors provide adequate warning to escape fire despite the results of the Indiana Dunes and Cal Chief's tests. Both tests assumed that escape from a burning home would be difficult or impossible at heat levels of 150 F. and smoke obscuration of 15% per foot. Figgie argues that these "tenability limits" are arbitrary, and that a reasonable person could

believe that escape is possible under more extreme conditions. Therefore, test results indicating that heat detectors provide inadequate warning of unrealistically low tenability limits do not mean that heat detectors are ineffective warning devices in practice.

The ALJ did acknowledge a debate among fire professionals as to the proper tenability limits. ALJ ¶ 157. However, he concluded that the "record leaves no doubt that there is substantial agreement now among fire scientists, on the basis of current learning, as to what these limits should be, and they appear to have a rational, scientific basis." Id. Specifically, the "150 F. heat tenability limit appears to be reasonable." ALJ ¶ 158. The Commission also rejected Figgie's attack on the tenability limits. It acknowledged that some persons could survive greater exposure to heat and smoke, but that "it is reasonable to assume that many others would suffer death or serious injury" at the tenability limits. Comm'n at 387. To the extent that the Commission determined the reasonable reading of the test results, its finding is conclusive.

A reasonable person would have known in the circumstances that selling the heat detectors as Figgie did was dishonest or fraudulent. A consensus among experts, well supported by careful testing, established that smoke detectors almost always provide earlier warning than heat detectors, and Figgie had no basis for doubting the truth of this consensus, yet Figgie marketed its heat detectors in a manner designed to mislead consumers about this critical information. As the Commission found, "the fact that smoke detectors almost always provide earlier warning than heat detectors would seem to be the single most useful piece of information that could be provided to potential purchasers of residential fire protection systems." Comm'n at 395. Figgie never provided this information to consumers, preferring to disparage the value of smoke detectors instead.

█ Figgie argues that it was reasonable to act on its own interpretation of the test results until the time the Commission's cease and desist order became final. We disagree. The Commission found that Figgie's market-

ing practices were deceptive in light of the test fires and the NFPA's rule changes. Once that information became available in the late 1970's, it was unreasonable for Figgie to ignore it. If Figgie's practices were "dishonest or fraudulent", it is because of their relationship to the known facts of fire safety, not their relationship to the history of this litigation.

## II. REMEDY

The district court ordered that Figgie pay into an escrow account to be managed by the Commission. "These funds shall be used to provide direct redress to consumers who purchased Vanguard heat detectors during [the redress period] and who can make a valid claim for such redress through the plaintiff, including prejudgment interest from the date of purchase (and to pay any attendant expenses of administration.)" At a minimum, Figgie would pay the amount of its profits, $7,590,000. At a maximum, Figgie would pay $49,950,000, the amount spent by consumers. Figgie challenges this order on several grounds.

### A. Consumer Injury

The relevant statutory language provides that

> The court in an action under subsection (a) of this section shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be. Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages.

15 U.S.C. § 57b(b).

The power bestowed is to "grant such relief as the court finds necessary to redress injury to consumers" resulting from dishonest or fraudulent trade practices. 15 U.S.C.

§ 57b(b). It follows, therefore, that there may be no redress without proof of injury caused by those practices. And the relief must be necessary to redress the injury.

### 1. Individual Reliance by Consumers

██ Figgie argues that because its liability is premised on certain misrepresentations or misleading statements, only those consumers that can prove that they purchased a Vanguard heat detector in reliance on those statements should be entitled to redress. As a factual matter, Figgie's argument that the district court had no proof of reliance is incorrect. Figgie's sales materials advocated the purchase of four or five heat detectors per smoke detector, and that matches Figgie's actual sales ratio. "It is reasonable to conclude from the record evidence that consumers purchased Vanguard heat detectors in reliance upon respondent's express and implied claim that heat detectors will provide necessary warning to allow a safe escape in most residential fires." ALJ ¶ 192.

██ Figgie's claim is also incorrect as a matter of law. It is well established with regard to Section 13 of the FTC Act (which gives district courts the power to order equitable relief) that proof of individual reliance by each purchasing customer is not needed.

> Proof of reliance by the consumer upon the defendants' misrepresentations is a traditional element of recovery under common law fraud actions. Section 13 of the FTC Act differs from a private suit for fraud, however. Section 13 serves a public purpose by authorizing the Commission to seek redress on behalf of injured consumers. Requiring proof of subjective reliance by each individual consumer would thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of the section.

*FTC v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1293 (D.C.Minn.1985). *See also FTC v. Security Rare Coin & Bullion*, 931 F.2d 1312, 1316 (8th Cir.1991). A presumption of actual reliance arises once the Commission has proved that the defendant made material misrepresentations, that they were widely disseminated, and that consumers purchased

the defendant's product. *Id.; Kitco,* 612 F.Supp. at 1293; *FTC v. International Diamond Corp.,* 1983–2 Trade Cases ¶ 65,725, p. 69,709, 1983 WL 1911 (N.D.Cal.1983) (*"Diamond II"*). Some courts hold that at this point, the burden shifts to the defendant to prove the absence of reliance. *Id.; Kitco,* 612 F.Supp. at 1293. The same reasoning is applicable to Section 19. Because Figgie has presented no evidence to rebut the presumption of reliance, injury to consumers has been established.

### 2. Amount of Refund Needed to Redress Injury

■ The Commission did not attempt to prove deaths or physical injuries resulting from the installation of Vanguard heat detectors rather than smoke detectors. The injury to consumers it sought to establish is the amount consumers spent on the heat detectors that would not have been spent absent Figgie's dishonest practices.

The district court ordered that consumers be allowed to receive full refunds for their Vanguard heat detectors, whose value, "given the misrepresentations recommended by Figgie and made by distributors to consumers, is de minimis." Figgie protests that the "de minimis" finding and the resulting full refund are inappropriate in light of the Commission's conclusive finding that heat detectors have some value. Although we agree with Figgie that the district court is not free to make this finding, we find the error harmless. Courts have previously rejected the contention "that restitution is available only when the goods purchased are essentially worthless." *FTC v. International Diamond Corp.,* 1983–2 Trade Cases ¶ 65,506, p. 68,-459, 1983 WL 1851 (N.D.Cal.1983) (*"Diamond I"*).

To understand why, we return to the hypothetical dishonest rhinestone merchant. Customers who purchased rhinestones sold as diamonds should have the opportunity to get all of their money back. We would not limit their recovery to the difference between what they paid and a fair price for rhinestones. The seller's misrepresentations tainted the customers' purchasing decisions. If they had been told the truth, perhaps they would not have bought rhinestones at all or only some. The district court implied this notion of a tainted purchasing decision with its qualification "given the misrepresentations recommended by Figgie and made by distributors to consumers." The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each detector that is not useful to them.

The district court's order creates no windfall for Figgie's customers. Refunds are available to those buyers "who can make a valid claim for such redress." Those who paid less than the $170 figure challenged by Figgie (and discussed *infra*) will therefore obtain redress based on the lesser figure. Those consumers who decide, after advertising which corrects the deceptions by which Figgie sold them the heat detectors, that nevertheless the heat detectors serve their needs, may then make the informed choice to keep their heat detectors instead of returning them for refunds.

■ Figgie also objects that the district court's order forces Figgie to pay for losses beyond its gains. Figgie does not contest the award of prejudgment interest and bases its argument instead on the role of the distributor in its marketing system. Figgie sells heat detectors for cash to distributors, who apparently have complete discretion to set their own mark-ups. Many consumer dollars therefore go into the distributors' pockets, not Figgie's.

This objection may be met several ways. First, Section 19(b) does not limit its remedies to the amount of the unjust enrichment. Statutory remedies include "the payment of damages." There is no question but that Figgie, which designed, authorized and supervised the dishonest sales presentations, was the proximate cause of consumers' loss. It may be held responsible for the damages it caused. Second, familiar principles of restitution support the district court's order. "While ordinarily the proper measure of restitution is the amount of enrichment received, if the loss suffered by the victim is greater than the unjust benefit received by the defendant, the proper measure of restitution may be to restore the status quo." *Dia-*

*mond I,* 1983–2 Trade Cases at p. 68,459. "As between the innocent purchaser and the wrongdoer who, though not a privy to the fraudulent contract, nonetheless induced the victim to make the purchase, equity requires the wrongdoer to restore the victim to the status quo." *Id.,* quoting *Gordon v. Burr,* 506 F.2d 1080, 1085 (2d Cir.1974). *See also Kitco,* 612 F.Supp. at 1295–96.

### B. Minimum Redress

■ Relief under Section 19(b) "may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting ... the unfair or deceptive act or practice ...; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages." The district court's judgment required that, at a minimum, Figgie be denied all of its profits from the redress period. Unclaimed money from the redress fund will be used for "indirect redress" in the form of corrective advertisements or donations to non-profit fire safety organizations. Figgie argues that the minimum redress provision amounts to an award of punitive damages forbidden by the statute.

Section 19(b) expressly contemplates corrective advertising in its "public notification" clause. The portion of the order that is questionable and could be barred as punitive is the provision for distributing unclaimed funds to non-profit fire safety organizations. We do find this portion in effect to be punitive. We can see no basis for allowing the Commission to keep money in excess of what it reasonably spends to find purchasers of the heat detectors, advertise to them the availability of the money and the importance of using smoke rather than heat detectors at appropriate locations, and process their claims and reimburse them. The FTC argues that it should be allowed to keep the money because it is in the nature of disgorgement, but the statute authorizes only

"redress ... to consumers," and specifically prohibits the imposition of "exemplary or punitive damages." 15 U.S.C. § 57b(b). If disgorgement of Figgie's receipts would exceed redress to consumers, then in the circumstances of this case requiring Figgie to pay the Commission the excess would be for purposes of punishing Figgie, not making redress to the consumers who bought heat detectors. Not all the receipts for heat detectors need be the result of deceptive practices, because the Commission found that the heat detectors had value, might reasonably have been purchased by some consumers, and that some of the claims made for them in the promotional materials were true. Because Congress provided for "redress," Figgie's receipts and profits provide neither the top nor the bottom limit of the remedy.

The district court's order provides that any unrefunded money be distributed by "donation to one or more nonprofit entities, at the discretion of the Commission, for the support of research, fellowships or consumer education in the field of fire safety." This extraordinary provision cannot be characterized as "redress." The word connotes making amends to someone who has been wronged. The nonprofit organizations, recipients of fellowships, researchers, and educators who might receive the money under this portion of the order were not wronged by Figgie's deceptive sales methods. Calling a fine "indirect redress" does not make it redress. An adjective, such as "indirect," cannot be used to exceed the statutory limitation on the remedy. Congress expressly prohibited exemplary or punitive damages under § 57b(b), so we know that its intent was not to punish deceptive trade practices, only to authorize redress to consumers and others for "injury resulting" from the trade practice. This portion of the award was outside the boundaries of the discretion given to the district court by the statute. The FTC cites cases under other statutes in which similar remedies have been upheld,[2] but in none of these does the statute limit

---

2. *Citronelle–Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717, 722–23 (TECA), *cert. denied,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982); *SEC v. Blavin,* 760 F.2d 706, 713 (6th Cir.1985); *Six Mexican Workers v. Arizona Citrus Growers,*

904 F.2d 1301, 1308 (9th Cir.1990); *Hodgson v. YB Quezada,* 498 F.2d 5, 6 (9th Cir.1974); *In re Folding Carton Antitrust Litigation,* 744 F.2d 1252, 1255 (7th Cir.1984); *SEC v. Lund,* 570 F.Supp. 1397, 1404–05 (C.D.Cal.1983).

recovery to redress and expressly prohibit exemplary or punitive damages. The district court should modify its order to provide for refund to Figgie of any funds not expended for authorized purposes.

### C. Maximum Redress

 The district court further held that if consumers claim more than the amount of Figgie's profits, Figgie would be liable to a maximum of $49.95 million, based on an average price per heat detector of $170. Figgie claims that the district court had no evidence to support the price. This figure was based on the declaration of Marjorie Lakin Erickson, an FTC director who compiled the prices described in 127 letters of complaint received from Vanguard customers. Figgie objected before the district court and this court that the declaration is hearsay. Because Federal Rule of Evidence 1006 permits the summarization of documents so long as the opposing party has opportunity to examine the originals (which Figgie did in this case), Figgie's objection is only valid if the letters themselves are inadmissible. *Keith v. Volpe*, 858 F.2d 467, 478–80 (9th Cir.1988), *cert. denied*, 493 U.S. 813, 110 S.Ct. 61, 107 L.Ed.2d 28 (1989).

 The letters from consumers do not fit squarely under any of the enumerated exceptions to the hearsay rule as codified by Federal Rules of Evidence 803(1)–(23). They are, however, admissible under the "catch-all" or "residual" exception, Federal Rule of Evidence 803(24):

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, [is not excluded] if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party

sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it[.]

This Rule facilitates "the admission of needed, relevant, reliable evidence which does not conform to a class exception." 4 Weinstein & Berger, Evidence, ¶ 803(24)[01] (1984) at 803–381. A court's most important inquiry under this Rule is whether the proffered evidence has trustworthiness equivalent to that of the enumerated hearsay exceptions. *Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir.1991). Its use in criminal trials must satisfy the rigors of the confrontation clause, *United States v. George*, 960 F.2d 97, 100 (9th Cir.1992), but its use in this civil case presents no constitutional questions.

 District courts must make detailed findings when admitting evidence under Rule 803(24). In the absence of such findings, an appellate court may review the record to determine if the prerequisites to admissibility have been met. *Mutuelles Unies v. Kroll & Linstrom*, 957 F.2d 707, 713 (9th Cir.1992); *George*, 960 F.2d at 100. The district court in this case made no findings, perhaps because the parties failed to frame the question in terms of Rule 803(24). The district court's error in failing to make findings is harmless in this case, however, because the letters in question clearly satisfy the five elements of the Rule.

First, they have the necessary "circumstantial guarantees of trustworthiness." The letters were sent independently to the FTC from unrelated members of the public. The fact that they all reported roughly similar experiences suggests their truthfulness. Furthermore, the declarants had no motive to lie to the FTC regarding the price they paid for their heat detectors. There is little risk that the prices listed in their letters were "the product of faulty perception, memory or meaning, the dangers against which the hearsay rule seeks to guard." 4 Weinstein & Berger at 803–375.

Second, the price of the heat detector is a material fact.

Third, "reasonable efforts" would not produce more probative evidence. Conceivably, FTC could bring letter-writers into court to

swear, under oath and subject to cross-examination, that the contents of their letters were true. But such efforts would not be reasonable. "It should not be necessary to scale the highest mountains of Tibet to obtain a deposition for use in a $500 damage claim arising from an accident with a postal truck." *Id.* at 803–379. Furthermore, testimony from the letter-writers is not likely to be any more reliable than the letters themselves. *See Dallas County v. Commercial Union Assurance Co.,* 286 F.2d 388 (5th Cir. 1961) (contemporary report of a fire in a newspaper article "is more reliable, more trustworthy, more competent evidence than the testimony of a witness called to the stand fifty-eight years later").

Fourth, admitting the letters "furthers the federal rules' paramount goal of making relevant evidence admissible." 4 Weinstein & Berger at 803–381. It also furthers the interests of justice by allowing the district court to establish the size of the redress fund so that it correlates to consumers' losses.

Fifth, Figgie had adequate notice of the letters. It could not have offered its generalized hearsay objection to the district court without knowing of them.

Because the letters were admissible to prove the prices paid by consumers, and because Figgie has offered no contrary evidence to suggest that they paid any other price, there is no genuine issue of material fact preventing summary judgment as to the maximum amount of redress.

Accordingly, the summary judgment on liability is AFFIRMED, but the summary judgment on damages is MODIFIED and the order VACATED for modification consistent with this opinion.