**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

<table>
<tr><td>U.S. COMMODITY FUTURES TRADING COMMISSION,<br><i>Plaintiff-Appellee</i>,<br><br>v.<br><br>JAMES DEVLIN CROMBIE,<br><i>Defendant-Appellant</i>.</td><td>No. 13-17403<br><br>D.C. No.<br>4:11-cv-04577-CW<br><br><br>OPINION</td></tr>
</table>

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, Senior District Judge, Presiding

Argued and Submitted December 19, 2018
San Francisco, California

Filed February 1, 2019

Before: Ronald M. Gould and Marsha S. Berzon, Circuit
Judges, and Frederic Block,[*] District Judge.

Opinion by Judge Berzon

---

[*] The Honorable Frederic Block, United States District Judge for the Eastern District of New York, sitting by designation.

## SUMMARY**

### Commodity Exchange Act

The panel affirmed in part and vacated in part the district court's judgment in favor of the Commodity Futures Trading Commission (the "Commission") in a civil enforcement brought against James D. Crombie, concerning false statements made to the National Futures Association ("NFA") during a March 2011 investigation.

The Commission alleged that by making misstatements to the NFA, Crombie violated 7 U.S.C. § 13(a)(4) of the Commodity Exchange Act, which makes it unlawful "willfully" to make false statements or provide false documents to certain regulatory organizations, including the NFA. The district court determined that Crombie on four separate occasions willfully violated § 13(a)(4).

The panel held that the district court erred in applying the civil meaning of "willfully," not the generally applicable criminal meaning. The panel further held that the meaning of "willfully" as used in § 13(a)(4) cannot sensibly vary depending on whether it is relied upon directly, in a criminal fraud case, or by incorporation into § 13a-1(a), in a civil case. The panel concluded that in § 13(a)(4) "willfully" must have the traditional meaning ascribed to the term in the context of criminal prohibitions against fraud: "intentionally undertaking an act that one knows to be wrongful." *United*

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*States v. Tarallo*, 380 F.3d 1174, 1188 (9th Cir. 2004), *amended by* 413 F.3d 928 (9th Cir. 2008).

Although the district court did not apply the heightened criminal standard for willful conduct, the panel nonetheless affirmed the grant of summary judgment to the Commission on the § 13(a)(4) claims after applying, de novo, the correct meaning of "willfully."

Concerning the remedies imposed by the district court, the panel held that the district court properly awarded restitution. The panel vacated in part the district court's order issuing a permanent injunction against Crombie. The panel held that as to §§ 4 and 5(a), (d), (e), (f), and (g) of the permanent injunction, the connection between the violations found and the prohibitions were sufficiently self-evident; and the panel concluded that the district court's inclusion of those future restraints on Crombie was not an abuse of discretion. The panel held that as to §§ 5(b) and (c) of the permanent injunction, the path from the violations found to the prohibitions ordered was not clear; and the panel remanded for further explanation as to those parts of the injunction.

**COUNSEL**

Jared L. Gardner (argued), Perkins Coie LLP, Anchorage, Alaska; Lauren Elizabeth Watts Staniar, Perkins Coie LLP, Seattle, Washington; for Defendant-Appellant.

Martin B. White (argued), Assistant General Counsel; Jonathan P. Robell, Senior Trial Attorney; Robert A. Schwartz, Deputy General Counsel; Jonathan L. Marcus, General Counsel; Daniel J. Davis, General Counsel; Commodity Futures Trading Commission, Washington, D.C.; for Plaintiff-Appellee.

**OPINION**

BERZON, Circuit Judge:

We are asked in this case to answer a recurrent question: What is the meaning of "willfully" in a federal statute? This malleable term may in some cases create difficult questions of statutory interpretation. *See, e.g.*, *Ratzlaf v. United States*, 510 U.S. 135, 141 (1994). Here, it does not. As we shall explain, in 7 U.S.C. § 13(a)(4), a provision within the Commodity Exchange Act ("Act"), "willfully" must have the traditional meaning ascribed to the term in the context of criminal prohibitions against fraud: "intentionally undertaking an act that one knows to be wrongful."[1] *United States v. Tarallo*, 380 F.3d 1174, 1188 (9th Cir. 2004), *amended by* 413 F.3d 928 (9th Cir. 2005).

---

[1] All statutory citations unless otherwise noted are to provisions of the Commodity Exchange Act, 7 U.S.C. § 1.

# I

This appeal arises from a civil enforcement action brought by the Commodity Futures Trading Commission ("Commission") against James D. Crombie. In March 2010, Crombie co-founded Paron Capital Management, LLC ("Paron"), an investment firm. Paron used a computer model developed by Crombie to invest in certain futures[2] on behalf of clients. The Commission alleged that Crombie misled potential investors by misrepresenting in marketing materials the past performance of Paron's computer model and misstating the amount of assets already under Paron's management, in violation of 7 U.S.C. §§ 6b(a)(1) and 6o(1).[3]

---

[2] "Futures" are contracts that allow an investor to purchase a particular commodity—such as crude oil, natural gas, corn, soybeans or wheat—at a set future date for a set price. Paron traded stock market index futures, which are futures contracts based on the future price of a specific stock market index, such as the S&P 500 or the Dow Jones Industrial Average. The Act covers these futures. *See* 7 U.S.C. § 1a(35); Commodity Futures Trading Comm'n & Sec. & Exch. Comm'n, Release No. 34-49469, Joint Order Excluding Indexes Comprised of Certain Index Options from the Definition of Narrow-Based Security Index (Mar. 25, 2004), https://www.sec.gov/rules/exorders/34-49469.htm.

[3] Section 6b(a)(1)(A)–(B) provides:

> It shall be unlawful— (1) for any person in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person . . . (A) to cheat or defraud or attempt to cheat or defraud the other person; [or] (B) willfully to make or cause to be made to the other person any false report

The Commission also alleged that Crombie made false statements to the National Futures Association ("NFA") during a March 2011 investigation by that industry group into Paron. The Commission claimed that by making these misstatements to the NFA, Crombie violated 7 U.S.C. § 13(a)(4), which makes it unlawful "willfully" to make false statements or provide false documents to certain regulatory organizations, including the NFA.[4]

The Commission filed suit in the Northern District of California in September 2011. After discovery, the district court granted summary judgment to the Commission. The court determined that Crombie violated § 13(a)(4) on four

---

> or statement or willfully to enter or cause to be entered for the other person any false record.

7 U.S.C. § 6b(a)(1)(A)–(B).

Section 6o(1) provides:

> It shall be unlawful for a commodity trading advisor, associated person of a commodity trading advisor, commodity pool operator, or associated person of a commodity pool operator, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—(A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6o(1).

[4] The Commission also brought claims against Paron. Those claims were settled in September 2012.

separate occasions, and that Crombie also violated §§ 6b(a)(1)(A)–(B) and 6*o*(1).[5]

Because the Commission did not request any relief in its summary judgment motion, the district court ordered the Commission to file a motion for requested relief and a proposed judgment. The Commission filed that motion and a proposed order and judgment two weeks later, in August 2013.

In November 2013, the district court granted the Commission's motion in an order that almost entirely adopted the language of the Commission's proposed order, without explaining why the particular relief was chosen. The order requires Crombie to pay a $750,000 civil penalty to the Commission and $746,460.28 in restitution, plus pre- and post-judgment interest, to Paron clients. The order also permanently enjoins Crombie from violating various provisions of the Act, as well as from engaging in a broad range of conduct related to the trading of investments regulated by the Act.[6] Among other provisions, the order permanently enjoins Crombie from "directly or indirectly . . . [e]ntering into any transactions involving commodity futures, options on commodity futures, commodity options . . . , security futures products, swaps, . . . and/or foreign currency . . . for his own personal account or for any account in which he has a direct or indirect interest," or "[h]aving

---

[5] The district court also denied summary judgment as to additional claims that Crombie violated § 13(a)(4) by making other false statements to the NFA. The Commission did not pursue these additional claims against Crombie.

[6] The court granted the injunction and ordered the restitution requested by the Commission. With regards to the civil penalty, the Commission had requested that the court impose a civil fine of $980,000.

any commodity futures, options on commodity futures, commodity options, security futures products, swaps, and/or [foreign currency] contracts traded on his behalf."

## II

Crombie now appeals the district court's grant of summary judgment to the Commission. We review this challenge de novo. *See, e.g.*, *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1086 (9th Cir. 2013).

## A

On summary judgment, the district court determined that Crombie on four separate occasions willfully violated § 13(a)(4). Crombie does not contest that he made false statements to the NFA during its investigation of Paron. He argues only that the district court misinterpreted the meaning of "willfully" for the purposes of the § 13(a)(4) claims, and that under the correct standard, there are genuine issues of material fact as to whether he acted willfully when he made three separate false statements to the NFA during its investigation of Paron.[7]

## 1

"The word 'willfully' is sometimes said to be 'a word of many meanings.'" *Bryan v. United States*, 524 U.S. 184, 191 (1998) (quoting *Spies v. United States*, 317 U.S. 492, 497 (1943)). But the proper meaning of "willfully" in § 13(a)(4) is unambiguous.

---

[7] Crombie does not contest that, under either standard, he willfully made false representations to the NFA with regards to a fourth category of false information.

Section 13(a)(4) is a criminal statute, with stiff penalties. "It shall be a felony punishable by a fine not more than $1,000,000 or imprisonment for not more than 10 years, or both, together with the costs of prosecution, for . . . . [a]ny person willfully to falsify, conceal, or cover up by any trick, scheme, or artifice a material fact, make any false, fictitious, or fraudulent statements or representations, or make or use any false writing or document knowing the same to contain any false, fictitious, or fraudulent statement or entry to a registered entity, board of trade, or futures association," such as the NFA. 7 U.S.C. § 13(a)(4). The Act also gives the Commission the ability to enforce this criminal provision via civil suit. 7 U.S.C. § 13a-1(a), (d). Section 13a-1(a) provides that whenever any person "has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of [the Act] or any rule, regulation, or order thereunder, . . . the Commission may bring an action . . . to enjoin such act or practice, or to enforce compliance with [the Act] . . . ."

"As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose.'" *Bryan*, 524 U.S. at 191. There are certain contexts in which a showing of bad purpose requires a showing that the defendant knew his actions were unlawful. *See id.* at 192; *see also Ratzlaf*, 510 U.S. at 140–46. But as to statutes that criminalize the making of false or misleading statements and other fraudulent activity—conduct that is obviously wrongful—we have repeatedly held that "'willfully' . . . does not require that the actor know specifically that the conduct was unlawful." *Tarallo*, 380 F.3d at 1188 (emphasis omitted); *see also United States v. English*, 92 F.3d 909, 914–16 (9th Cir. 1996). Rather, a defendant makes false statements "willfully" for purposes of a criminal statute prohibiting such statements if the defendant knew the

statements were false when made, "or else made them with a reckless disregard for whether they were false." *Tarallo*, 380 F.3d at 1188–89.

In contrast, in civil contexts, a person acts "willfully" if she "intentionally does an act which is prohibited,— irrespective of evil motive or reliance on erroneous advice . . . ." *Lawrence v. CFTC*, 759 F.2d 767, 773 (9th Cir. 1985) (quoting *Flaxman v. CFTC*, 697 F.2d 782, 787 (7th Cir. 1983)).  When adjudicating the § 13(a)(4) claims on summary judgment, the district court applied the civil meaning of "willfully," not the generally applicable criminal meaning.  The Commission maintains that the district court was correct, because the Commission is pursuing violations of § 13(a)(4) via a civil suit.  We cannot agree.

The term "willfully" appears in § 13(a)(4), a criminal provision of the Act, *not* in § 13a-1(a), the provision of the Act permitting civil enforcement.  Nor does § 13a-1(a) prescribe a separate mens rea that applies in civil-enforcement proceedings.  It just states that the Commission may bring an action to enforce compliance with "any provision" of the Act.  7 U.S.C. § 13a-1(a).

Given this context, the meaning of "willfully" as used in § 13(a)(4) cannot sensibly vary depending on whether it is relied upon directly, in a criminal fraud case, or by incorporation into § 13a-1(a), in a civil case.  And because it appears in a criminal statute, "willfully" means "intentionally undertaking an act that one knows to be wrongful; 'willfully' in this context does *not* require that the actor know specifically that the conduct was unlawful." *Tarallo*, 380 F.3d at 1188.  A defendant makes false statements "willfully" under this standard if the defendant knew the statements were false, "or else made them with a reckless disregard for whether they were false." *Id.*

**2**

Although the district court did not apply this somewhat heightened criminal standard for willful conduct, we nonetheless affirm the grant of summary judgment to the Commission on the § 13(a)(4) claims after applying, de novo, the correct meaning of "willfully." For each of the three claims disputed by Crombie, we are convinced that there is no genuine dispute of material fact as to whether Crombie acted willfully under the *Tarallo* standard.

During the NFA's investigation, Crombie provided the NFA with statements purporting to show the value of accounts Crombie had managed between 2006 and 2008 as part of a prior venture called JDC Ventures ("JDC"). The statements provided by Crombie stated that the JDC-managed accounts were worth over $13.8 million in February 2008, and over $24 million in December 2008. In fact, the accounts had a steady balance of only $40 from late 2007 onward; had no trades in 2008; and closed in February 2008. At his deposition, Crombie testified that he was aware of the day-to-day performance of the accounts he had managed.

These facts unequivocally establish that when Crombie provided the NFA the inaccurate account statements, he acted willfully. Crombie either knew the statements he provided to the NFA misrepresented the value of the JDC-managed accounts, or he provided those statements to the NFA "with a reckless disregard for whether they were false." *Tarallo*, 380 F.3d at 1188.

During the NFA's investigation, Crombie also misrepresented the nature of a $200,000 payment Crombie made to Paul Porteous in May 2009. Crombie told the NFA that he had paid Porteous $200,000 in exchange for

Porteous's share in JDC. In fact, as Crombie later admitted during this litigation, Crombie owed Porteous $1.15 million, and the $200,000 payment was made in partial repayment of that debt. Again, these facts make clear that Crombie either "made statements [to the NFA] that he knew at the time were false, or else made them with a reckless disregard for whether they were false." *Id.*

Finally, Crombie told the NFA during its investigation that Steven Lamar had paid JDC $300,000 in exchange for certain financial advice JDC provided to Lamar's hedge fund. In his statement, Crombie told the NFA that the $300,000 payment was made in two separate transfers, one of which was a $50,000 transfer made on May 4, 2009. Later in the investigation, however, Crombie told the NFA that the $50,000 payment made on May 4, 2009, was an investment in JDC. Eventually, during litigation, he admitted that the $50,000 payment was in fact a loan made to JDC by Lamar's hedge fund.

Crombie argues that, because he used the terms "loan" and "investment" interchangeably, he was not acting willfully when he made these false representations. But Crombie did not initially describe the $50,000 payment as either an investment or a loan; he first described the payment as a fee for services rendered. This description was undoubtedly false, and Crombie had to know the description was false. There is thus no genuine issue as to whether Crombie acted willfully when he misrepresented the nature of the $50,000 payment to the NFA.

**B**

The district court was also correct to grant summary judgment to the Commission on its claims that Crombie misled investors in violation of 7 U.S.C. §§ 6b(a)(1)(A)–(B)

and 6*o*(1), two provisions of the Act that prohibit certain fraudulent conduct in connection with the trading of commodities and futures.

The basic facts underlying these claims are as follows: Paron's marketing materials stated that Paron managed $35 million, including one account with $20 million. But Paron in fact managed only $15 million. The largest managed account contained only $6 million. The marketing materials also misrepresented certain performance figures for the JDC-managed accounts. For example, Paron represented in the marketing materials that JDC-managed accounts generated returns of 38.6 percent in 2008; but as discussed above, those accounts in fact had a steady balance of $40 starting in late 2007; had no trades in 2008; and closed in February 2008.

Crombie does not dispute these facts. He argues only that there is a genuine dispute of material fact regarding whether Crombie possessed the mental state necessary to violate § 6b(a)(1)(A)–(B).

Section 6b(a)(1)(A)–(B) makes it unlawful for any person "to cheat or defraud," or "willfully to make or cause to be made to [another] person any false report or statement" in connection with certain commodity-related transactions. A showing of scienter is necessary to establish a violation § 6b(a)(1)(A)–(B); in other words, the defendant "must have known that he was cheating" or "known the report was false," as the case may be. *CFTC v. Savage*, 611 F.2d 270, 283 (9th Cir. 1979). *Savage* further held that "[k]nowledge . . . exists when one acts in careless disregard of whether his acts amount to cheating, filing false reports, etc." *Id.*

Crombie maintains that he did not know he was cheating, under subsection (A), or making any material false

statements, under subsection (B), because he reasonably relied on reports created by third-party accountants that purportedly verified the 38.6 percent figure, as well as the other representations regarding the performance of the JDC-managed accounts. This contention fails.

First, the third-party accountants' reports did not provide any basis for Crombie to believe that Paron in fact managed $35 million in total assets, or to believe that Paron managed a $20 million account. So Crombie knew that he was making false statements when he misrepresented the amount of assets managed by Paron. *See id.*

Second, Crombie testified that he was aware of the day-to-day performance of the accounts JDC managed. Crombie was thus aware that the accounts JDC managed consistently had $40 in assets while open in 2008, and closed completely in February of that year. Even though Crombie received third-party reports that purported to verify the 38.6 percent performance figure, he could not have legitimately believed that the accounts JDC managed had generated 38.6 percent returns, given what he knew about those accounts. Thus, he acted with the requisite scienter—he knew the performance figures he was representing were false. *See id.*

Crombie similarly argues that there is a genuine dispute of material fact regarding whether Crombie possessed the mental state necessary to violate § 6*o*(1). Section 6*o*(1), like § 6b(a)(1)(A)–(B), makes unlawful fraudulent conduct committed in connection with commodity transactions. But unlike § 6b(a)(1), § 6*o* covers only a limited set of regulated people: "commodity trading advisor[s]", "commodity pool operator[s]", and their "associated person[s]." For this limited class of people covered by § 6*o*(1), the Commission need only show that "the violator . . . acted intentionally. . . . If the trading advisor or commodity pool operator intended

to do what was done and its consequence is to defraud the client or prospective client[,] that is enough . . . ."**[8]** *Savage*, 611 F.2d at 285.  All of the evidence suggests Crombie acted intentionally when providing the false and misleading marketing materials to potential clients; no evidence suggests otherwise.  Thus, there is no genuine dispute as to whether he acted intentionally.

## III

Crombie also challenges the propriety of the remedies imposed by the district court.  We review the remedies issued by a district court for an abuse of discretion.  *See Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1163 (9th Cir. 2001).

## A

The pertinent remedy provision, 7 U.S.C. § 13a-1(a), provided at the time of Crombie's statutory violations that "the Commission may bring an action . . . to enjoin [a violation of the Act], or to enforce compliance with [the Act], or any rule, regulation or order thereunder."  Section 13a-1 also provided that the Commission could seek civil penalties for violations of the Act.  7 U.S.C. § 13a-1(d); *see*

---

**[8]** Relying on the Seventh Circuit's decision in *Commodity Trend Service, Inc. v. CFTC*, 233 F.3d 981, 993–94 (7th Cir. 2000), Crombie argues that § 6*o*(1) requires a showing that the defendant acted with negligence.  *See id.*; *see also Messer v. E.F. Hutton & Co.*, 847 F.2d 673, 677–79 (11th Cir. 1988) (holding that § 6*o*(1)(A) includes a scienter requirement).  This argument is foreclosed by *Savage*.  611 F.2d at 285.  Moreover, even if § 6*o*(1) required a showing of negligence or scienter, it would nonetheless be appropriate to grant summary judgment to the Commission for the same reasons it is appropriate to grant summary judgment under § 6b(a)(1)(A)–(B).

*also* 17 C.F.R. § 143.8(b).     Although § 13a-1 did not explicitly so state, both this circuit and other circuits have long held that district courts have the authority to order traditional equitable relief in actions brought under § 13a-1, as part of their authority to enforce compliance with the Act.[9] *See CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 583 (9th Cir. 1982); *CFTC v. Hunt*, 591 F.2d 1211, 1222–23 (7th Cir. 1979); *see also CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1344 (11th Cir. 2008) (citing cases).   More specifically, *Co Petro Marketing Group* held that the district court could under § 13a-1 properly order an accounting of profits and disgorgement of those profits.   680 F.2d at 583. An accounting and disgorgement of profits is a classic form of restitutionary relief.   Restatement (3d) of Restitution and Unjust Enrichment § 51 cmt. e (2011) [hereinafter *Restatement of Restitution*]; *see also id.* §§ 3, 51(4); *Wilshire Inv. Mgmt.*, 531 F.3d at 1344 (holding that an order of restitution was authorized under § 13a-1).

Crombie does not challenge whether the amount of the restitution order rests on an accurate calculation of losses suffered by Paron's investors.   Instead, he maintains that the entire methodology was incorrect, because restitution "does not take into consideration the plaintiff's losses, but only focuses on the defendant's unjust enrichment."   *Wilshire*, 531 F.3d at 1345.

---

[9] In 2011, Congress amended 7 U.S.C. § 13a-1 as part of the Dodd-Frank Act to state explicitly that district courts in actions brought under § 13a-1 could "impose . . . equitable remedies," including "restitution to persons who have sustained losses proximately caused" by violations of the Act.   Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111–203, title VII, § 744, 124 Stat. 1376, 1735 (2011).   Neither party contends that the amended version of the statute applies here, so we do not consider whether it does.

Crombie's view of the limits of a restitutionary remedy is too narrow. Restitution is a remedy designed to prevent a defendant from unjustly enriching himself at another's expense. *Restatement of Restitution* §§ 1, 3, 49. Where a defendant has profited from his wrongful actions, restitution can take the form of an order requiring the defendant to disgorge those wrongfully gotten profits and transfer them to the victims. *Id.* § 51(4); *see also Co Petro Mktg. Grp.*, 680 F.2d at 583.

But there are instances in which a defendant does not ultimately reap any profits from his wrongful conduct, and others where even though the defendant obtained some profit, the "loss suffered by the victim is greater than the unjust benefit received by the defendant . . . ." *FTC v. Figgie Int'l., Inc.*, 994 F.2d 595, 606 (9th Cir. 1993) (quotation omitted); *see also FTC v. Stefanchick*, 559 F.3d 924, 931 (9th Cir. 2009).[10] In these circumstances, restitution can be coupled with the equitable remedy of rescission, which undoes a faulty transaction. *See Figgie Int'l.*, 994 F.2d at 606–07; 1 Dobbs, Law of Remedies § 4.3(6) (2d ed. 1993); *Restatement of Restitution* § 54; *see also Commerce Planet*, 815 F.3d at 603.

Here, coupling these two remedies was appropriate. Customers who entered into agreements with Paron did so because of fraudulent misrepresentations by Crombie, such

---

[10] The Federal Trade Commission Act, like the Commodity Exchange Act, grants courts broad authority to prevent fraudulent conduct violating that act. *See FTC v. Commerce Planet, Inc.*, 815 F.3d 593, 598 (9th Cir. 2016); *Figgie Int'l.*, 994 F.2d at 605. Cases interpreting the Federal Trade Commission Act rely on traditional principles of equity that apply across statutory regimes, so their reasoning is persuasive here.

as the misrepresentations as to the amount of assets under management and the past performance of funds managed by Crombie. *See* pp. 12–15, *supra*. Based on these facts, rescission of the contracts entered into as a result of fraud was an appropriate equitable remedy. Concomitantly, an order that Crombie pay back to the investors the money that they invested in Paron as part of the rescinded transaction less the amount already returned by Paron was proper.[11] The amount Parons' clients invested with Paron less the amount returned by Paron is equivalent to the amount Paron's clients lost because they invested with Paron.

The district court did not spell out this reasoning. But the Commission submitted a declaration explaining how the restitutionary amount adopted by the district court was arrived upon. As noted, Crombie only challenges the legal propriety of the Commission's victim-based theory of restitution, not the calculation of the restitution amount if the approach taken is permissible. As we have concluded that the method of determining restitution used by the district court was legally permissible, to require a further explanation by the district court would be an empty formality. *Cf. Traxler v. Multnomah Cty.*, 596 F.3d 1007, 1016 (9th Cir. 2010) (remand was required where there was no reasoned decision *and* "[t]he record does not permit us to infer a rationale").

---

[11] To effectuate the order of restitution, the district court appointed the NFA as a monitor with the power to "collect restitution payments from Crombie" and to "determine the manner of distribution of such funds in an equitable fashion to Crombie's and/or Paron's customers or clients identified by the [Commission]."

**B**

Although we affirm the restitution order, we vacate in part the district court's order issuing a permanent injunction against Crombie.  To evaluate a district court's decision under the abuse of discretion standard, "we must be able to ascertain how the district court exercised its discretion." *Id.* at 1015.  Where the connection between the terms of an injunction and the violations sought to be remedied is apparent, we are usually able to ascertain the basis for the district court's restrictions sufficiently that no further explanation is needed for purpose of appellate review.  When that evident link is missing, however, "we must remand to that court to reconsider its decision and to set forth its reasons for whatever decision it reaches, so that we can properly exercise our powers of review." *Id.* (quoting *Blue Cross & Blue Shield of Ala. v. Unity Outpatient Surgery Ctr., Inc.*, 490 F.3d 718, 724–25 (9th Cir. 2007)).

Here, the district court adopted the Commission's proposed injunction in toto and provided no specific explanation as to why it adopted any of the suggested provisions.  Much of the Permanent Injunction restrains Crombie from violating various provisions of the Act.  Other provisions forbid him from engaging in trading in covered financial products and registering to do so.  As to all such provisions—§§ 4 and 5(a), (d), (e), (f), and (g) of the Permanent Injunction—the connection between the violations found and the prohibitions are sufficiently self-evident that we can—and do—conclude that the district court's inclusion of those future restraints on Crombie was not an abuse of discretion.

As to two other sections of the Permanent Injunction, however, the path from the violations found to the prohibitions ordered is not as clear.  Sections 5(b), and (c) of

the Permanent Injunction forbid Crombie from engaging in covered transactions "for his own personal account or for any account in which he has a direct or indirect interest," or from having any such trades made on his behalf. As we cannot readily discern how these prohibitions are connected to preventing future violations similar to those that Crombie has committed, we cannot conduct meaningful abuse of discretion review without further explanation. We therefore remand for further explanation as to those parts of the Permanent Injunction.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**