2014 COA 14

**The PEOPLE of the State of Colorado, Plaintiff–Appellee and Cross–Appellant,**

v.

**Leonid SHIFRIN, a/k/a Leo Shifrin, Defendant–Appellant,**

and

**Mark Shifrin, Defendant and Cross–Appellee.**

**Court of Appeals Nos. 11CA1853 & 11CA1881**

Colorado Court of Appeals, Div. IV.

Announced February 27, 2014

508

**510**

City and County of Denver District Court No. 08CV1047, Honorable Brian R. Whitney, Judge

John W. Suthers, Attorney General, Alissa H. Gardenswartz, Assistant Attorney General, Jennifer Miner Dethmers, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee

Leonid Shifrin, Pro Se

No Appearance for Defendant and Cross–Appellee

Opinion by JUDGE WEBB

¶ 1 In this action under the Colorado Consumer Protection Act (CCPA), sections 6–1–101 to –115, C.R.S.2013, defendant, Leonid Shifrin (defendant), appeals the judgment entered against him and in favor of the State of Colorado. The Attorney General cross-appeals the directed verdict entered in favor of Mark Shifrin, defendant's father (Shifrin).

Shifrin has not entered an appearance on appeal.

¶ 2 The Attorney General brought this action against defendant, Shifrin, Jerry A. Johnson, and five companies with which defendant was involved. The complaint alleged a pattern of deceptive trade practices whereby defendants, acting in concert, placed consumers in high risk, "option" adjustable rate mortgage (ARM) loans.[1]

¶ 3 Before trial, Johnson settled, and the court entered default judgments against two of the companies. The case proceeded to a bench trial. At the conclusion of the Attorney General's case, the court granted Shifrin's motion for a directed verdict.

¶ 4 After trial, the court issued a detailed written order and judgment finding that the remaining defendants—except Mortgage Processing Group, Inc.—had violated the CCPA by perpetrating a pattern of deceptive trade practices. It entered judgment against defendant and the other corporate defendants for injunctive relief, civil penalties, restitution, disgorgement, and attorney fees.

¶ 5 As to the appeal, we conclude that consumer affidavits should not have been admitted, vacate a portion of the damages awarded, remand for damages to be recalculated, and otherwise affirm. As to the cross-appeal, we vacate the directed verdict for Shifrin and remand for the court to rule on the Attorney General's motion for default judgment as a discovery sanction. If default judgment is not entered, then the court shall reconsider Shifrin's motion for a directed verdict as a motion to dismiss under C.R.C.P. 41(b)(1).

## APPEAL

### I. Issues of First Impression

¶ 6 Although defendant's pro se briefs are unclear as to some contentions, he raises the following questions of first impression under the CCPA:

---

1. An option ARM may appear to a consumer as a traditional ARM. But the interest rate on an option ARM adjusts monthly. And an option ARM requires only a minimum payment that neither covers all interest nor retires any principal.

- Whether claims under CCPA section 6–1–110(1) are triable to a jury (Section III);

- Whether such claims can be proven by testimony of representative consumer witnesses, without testimony from all consumers who were harmed by the alleged violation (Section V);

- Whether consumer affidavits are admissible to prove damages (Section VI); and

- Whether defendant is entitled to a setoff for the settlement amount paid by Johnson (Section X).

Because we conclude that the affidavits were inadmissible hearsay, we need not decide whether consumer affidavits would ever be sufficient to prove restitution and disgorgement. Otherwise, we resolve these questions against defendant.

## II. Background

¶ 7 Defendant did not designate a transcript of the trial. The Attorney General designated only a small portion of trial testimony relevant to the cross-appeal. The following information was derived from pretrial filings, the trial court's Order of Judgment, post-trial filings, and the court's ruling on those filings.

¶ 8 At trial, the Attorney General called thirteen representative consumers and presented affidavits from the remaining consumers. The court agreed with defendants that affidavits were insufficient to prove specific CCPA violations for those consumers. Yet, relying on CCPA section 6–1–112 ("for purposes of this paragraph (a), a violation of any provision shall constitute a separate violation with respect to each consumer or transaction involved"), the court concluded that if it found a violation, "the affidavits can be used to determine remedy."

¶ 9 The Attorney General presented testimony that defendants, acting in concert, used print advertising promising low fixed rate mortgages to draw in consumers, who were then directed to companies owned, operated, or controlled by defendant. Those consumers were presented with option ARM loans that did not comply with the advertised terms. They were not· provided with required disclosures and were charged fees different from what they had been told would be assessed. Some of them were lied to· about the option ARM terms. Defendant did not assist consumers who complained about the terms of the loans that they had received. Those who were able to rectify the problems incurred considerable expense.

¶ 10 The trial court recognized lack of evidence that the advertised terms were not then available. But it credited the testimony of consumers that while "they believed the ads were for a fixed rate loan," which they requested, they "ended up in an option-ARM with a teaser rate either at or lower than the advertised rate and were unaware that that is what they were getting." Then, "the teaser rate would change and do so rapidly after the term of the loan began."

¶ 11 After summarizing the representative consumers' testimony, the court found that the Attorney General had proven a "scheme" that "in various stages violates C.R.S. 6–1–10[5](e), (g), (i), (u), and when the practice involved mortgage brokering, subsection (uu)." It also found that, "when an organization is made up of entities whose common purpose can be shown through pattern practice to nullify the individuality of the entities, liability can be found for the individual entities as a 'person' under the Act."

¶ 12 The court enjoined defendant from engaging in a wide variety of real estate and financial activities. It awarded, jointly and severally:

- The statutory maximum civil penalty of $100,000, considering only "the testifying consumers and the ads directly testified about";

- Restitution of $566,050.47, using "a simple mathematical calculation which compared the rates promised with the ones given and the difference thereof over the life of the relevant period of affect"; and

- Disgorgement of $246,723.74, limited to "the actual consumer complaints received by the State and offered to the Court through deposition, testimony and affidavit."

The court also awarded attorney fees against defendants, jointly and severally, of

$1,428,516.50, the amount requested by the Attorney General.

### III.  Jury Trial

¶ 13 Defendant first contends the trial court erred in ruling that he was not entitled to a jury.  Based on the equitable nature of the relief sought under the CCPA, we discern no error.

### A.  Preservation and Standard of Review

¶ 14 Defendant preserved this issue by filing a jury demand, which the court struck on the Attorney General's motion.  An appellate court reviews a party's right to a jury trial in a civil action de novo.  *Stuart v. N. Shore Water & Sanitation Dist.*, 211 P.3d 59, 61 (Colo.App.2009).

### B.  Law

¶ 15 In Colorado, the right to a civil jury trial is not constitutional.  It exists by virtue of statutes and court rules.  *First Nat'l Bank of Meeker v. Theos*, 794 P.2d 1055, 1058 (Colo.App.1990).  The CCPA does not provide for trial by jury.  Thus, the right to a jury trial in a CCPA action must be derived from C.R.C.P. 38(a).

¶ 16 Under that rule, a party has a right to a jury trial only in proceedings that are primarily legal, rather than equitable, in nature.  *See Zick v. Krob*, 872 P.2d 1290, 1293 (Colo.App.1993).  In deciding whether a proceeding is legal or equitable for this purpose, the "determinative issue is the characterization of the nature of the relief sought." *Watson v. Pub. Serv. Co. of Colo.*, 207 P.3d 860, 865 (Colo.App.2008) (internal quotation marks omitted); *see First Nat'l Bank of Meeker*, 794 P.2d at 1059 ("It is the character of the complaint ... that fixes the nature of the suit and determines whether it should be tried in equity or at law.").

¶ 17 Generally, "[a]ctions for money damages are considered legal." *Stuart*, 211 P.3d at 62.  But "not all forms of monetary relief need necessarily be characterized as legal relief for purpose of the jury trial requirement." *Watson*, 207 P.3d at 865 (internal quotation marks and alterations omitted).  Thus, even where a plaintiff seeks to recover money damages, a jury trial is not required "if the essence of the action is equitable in nature." *Id.*

### C.  Application

¶ 18 Defendant argues that the character of the CCPA action was legal because the Attorney General sought to recover money damages and impose civil penalties, both of which are economic.  Even so, the Attorney General sought monetary relief in the form of civil penalties and under the equitable principles of restitution and disgorgement.  *See Berger v. Dixon & Snow, P.C.*, 868 P.2d 1149, 1152 (Colo.App.1993) ("The remedy of restitution is based on the general principle that one should not be permitted to keep that which in equity and good conscience should be restored to another."); *see also United States v. Universal Mgmt. Servs., Inc.*, 191 F.3d 750, 760–61 (6th Cir. 1999) ("Restitution and disgorgement are part of courts' traditional equitable authority."); *Lloyd A. Fry Roofing Co. v. State*, 191 Colo. 463, 470, 553 P.2d 800, 806 (1976) (imposition of civil penalties alone does not mandate a jury trial).

¶ 19 The majority of courts in other jurisdictions have concluded that similar consumer protection actions are primarily equitable.[2] Because we consider these cases well-reasoned, and several of them involve statutes similar to the CCPA, we follow them here.

¶ 20 *State ex rel. Douglas v. Schroeder*, 222 Neb. 473, 384 N.W.2d 626, 630 (1986), is illustrative.  There, the court explained that

---

**2.** *See, e.g., State by Humphrey v. Alpine Air Prods., Inc.*, 490 N.W.2d 888, 895 (Minn.App.1992) (action under consumer fraud act – where restitution and injunction were sought – was "entirely equitable in nature.  The state's primary objective was to ... put an end to Alpine's conduct that misled consumers, threatened their health and inhibited competitiveness in the marketplace."); *State v. State Credit Ass'n, Inc.*, 33 Wash.App. 617, 657 P.2d 327, 330 (1983) ("The relief available in a consumer protection action brought by the State [including restitution, injunction and civil penalties] is entirely equitable."); *see also Fed. Trade Comm'n v. Kitco*, 612 F.Supp. 1280, 1281 (D.Minn.1985) (no jury trial right exists in consumer fraud action by the FTC seeking rescission and restitution).

although the Nebraska Consumer Protection Act "permits the recovery of an attorney fee, restoration of the purchase price, and the imposition of civil penalties, its principal thrust is to prevent unfair or deceptive acts or practices in trade or commerce." *Id.* at 629–30. The court concluded that "the act is equitable in nature, in the sense that it seeks to prevent prejudicial conduct rather than merely compensate such damage as may flow therefrom." *Id.* at 630. It explained the "monetary consequences imposed to discourage future like acts and practices are ancillary to the act's principal equitable thrust." *Id.*

¶ 21 Similarly, the CCPA "serves more than a merely restitutionary function. A primary purpose of the CCPA is to deter and punish deceptive trade practices." *Hall v. Walter,* 969 P.2d 224, 231 (Colo.1998); *see May Dep't Stores Co. v. State ex rel. Woodard,* 863 P.2d 967, 972 (Colo.1993) ("Because the CCPA's civil penalty requirement is intended to punish and deter the wrongdoer and not to compensate the injured party, the CCPA is intended to proscribe deceptive acts and not the consequences of those acts.").

¶ 22 Accordingly, we conclude that defendant was not entitled to a jury trial.

### IV. Stay

¶ 23 Defendant next contends the trial court erred by refusing to stay the trial, pending resolution of federal criminal proceedings against him. We discern no abuse of discretion.

### A. Preservation and Standard of Review

¶ 24 Defendant preserved this issue by joining in the other defendants' motion for a stay. Denial of a stay is reviewed for an abuse of discretion. *Morrison v. Goff,* 91 P.3d 1050, 1056 (Colo.2004).

### B. Law

¶ 25 "[A] stay of [a] civil case to permit conclusion of a related criminal proceeding has been characterized as an extraordinary remedy." *Louis Vuitton Malletier S.A. v. LY USA, Inc.,* 676 F.3d 83, 98–100 (2d Cir.2012) (internal quotation marks omitted)

(explaining the defendants face a heavy burden "in overcoming a district court's decision to refrain from entering a stay").

¶ 26 Deciding whether a stay is appropriate "generally requires balancing the interests of the plaintiff in moving forward with the litigation against the interests of a defendant asserting Fifth Amendment rights who faces the choice of being prejudiced in the civil litigation if those rights are asserted or prejudiced in the criminal litigation if those rights are waived." *AIG Life Ins. Co. v. Phillips,* No. 07–cv–00500, 2007 WL 2116383, at *2 (D. Colo. July 20, 2007) (internal quotation marks omitted). In weighing such interests, courts have considered the following six factors:

1) the extent to which the issues in the criminal case overlap with those presented in the civil case; 2) the status of the case, including whether the defendants have been indicted; 3) the private interests of the plaintiffs in proceeding expeditiously weighed against the prejudice to plaintiffs caused by the delay; 4) the private interests of and burden on the defendants; 5) the interests of the courts; and 6) the public interest.

*Id.* Because these factors "do no more than act as a rough guide for the [trial] court as it exercises its discretion," the ultimate decision "requires and must rest upon a particularized inquiry into the circumstances of, and the competing interests in, the case." *Louis Vuitton Malletier S.A.,* 676 F.3d at 99 (internal quotation marks omitted).

### C. Application

¶ 27 Below, defendants argued that a stay was appropriate pending resolution of defendant's criminal proceeding for the following reasons: "issues in the two cases overlap"; he was "ordered not to have contact with material witnesses (and a co-defendant)" in the criminal case; "the interests of justice so require";· and his "interests in avoiding the quandary of choosing between waiving his Fifth Amendment rights outweighs [the Attorney General's] interest in an expeditious resolution."

¶ 28 The trial court denied the motion. It found "no evidence of commonality sufficient to raise constitutional difficulty," and explained that "[a]ny perceived issue of self-incrimination [could] be handled ... easily as it is a trial to the Court." As to the *Phillips* factors, the court explained:

[Defendants] failed to show sufficient overlap of issues except to point out the possibility of evidentiary overlap concerning one aspect of the case concerning one of the defendants. Further, [defendants] ha[ve] incorrectly prejudged the breadth of the immunity to that defendant concerning information made in discovery or at trial. The Court finds that the public interests, the [Attorney General's] interest and the interest of the Court taken as a whole outweigh what has been presented as a "potential" privacy interests of the one defendant. The Court finds the only factor in determining if a stay is warranted is that an indictment has been returned on ... defendant. Balanced against the five other factors, the Court reaffirms its prior ruling and denies the stay.

The record supports the trial court's decision.

¶ 29 For example, the issue in defendant's criminal proceeding—whether he had properly reported his income to the Internal Revenue Service—did not overlap with whether defendant had made misleading and deceptive representations to consumers in connection with mortgage loans. And imposing a stay pending final resolution of the criminal case, which may include appeals, would frustrate the purpose of the CCPA to provide "prompt, economical, and readily available remedies against consumer fraud." *W. Food Plan, Inc. v. Dist. Court,* 198 Colo. 251, 256, 598 P.2d 1038, 1041 (1979).

¶ 30 Nevertheless, defendant argues that lack of a stay created a dilemma: if he testified in this case, his testimony could be used against him in the federal criminal proceeding; but if he did not testify in this case, his defense would suffer. Defendant fails to support this argument by explaining what proposed testimony in this case would have been relevant to, and thus admissible in, the federal case. Merely positing a theoretical dilemma does not show that the trial court abused its discretion.

¶ 31 True, defendant's indictment favors a stay. Even so, such an indictment is less probative where, as the court found here, the two proceedings have minimal overlap. *See Alcala v. Texas Webb County,* 625 F.Supp.2d 391, 401 (S.D.Tex.2009) ("[E]ven after an indictment has issued ... to warrant a stay, a defendant must make a strong showing that the two proceedings will ... overlap." (citations omitted)).

¶ 32 Accordingly, we conclude that the trial court did not abuse its discretion by refusing to stay the trial.

### V. Representative Witnesses

¶ 33 Defendant next contends the trial court erred by finding a CCPA violation based on the testimony of representative witnesses, without requiring testimony from all thirty-seven borrowers allegedly harmed. We discern no error.

### A. Preservation and Standard of Review

¶ 34 Before trial, the Attorney General moved to allow the testimony "of approximately one half" of the borrowers as representative witnesses to prove defendant's CCPA violations. Defendants opposed the motion. The trial court explained that:

The CCPA does not set forth any rigid guidelines for the means or method to establish liability ... [and] there is also no explicit requirement that all or any percentage of consumers are required to testify in any action....

It concluded that "if the Attorney General believes that representative witnesses are sufficient to prove his case that Defendants conducted the alleged deceptive trade practices, he has the discretion to do so."

¶ 35 The court's interpretation of the CCPA that it does not prohibit proof by representative witness testimony is reviewed de novo. *See U.S. Fax Law Ctr., Inc. v. Henry Schein, Inc.,* 205 P.3d 512, 515 (Colo. App.2009) (interpreting the CCPA). The trial court's conclusion that the representative witnesses' testimony was sufficient to prove a CCPA violation poses a mixed question of

law and fact. *State ex rel. Suthers v. Mandatory Poster Agency, Inc.*, 260 P.3d 9, 15 (Colo.App.2009). As fact finder, the trial court assesses the witnesses' credibility and determines the probative effect and weight of the evidence. *Id.* We defer to these determinations unless they are clearly erroneous or unsupported by the record. *Id.*

## B. Analysis

■ ¶ 36 The CCPA empowers the Attorney General to initiate actions against persons engaged in deceptive trade practices. *Gen. Steel Domestic Sales, LLC v. Hogan & Hartson, LLP*, 230 P.3d 1275, 1282 (Colo. App.2010); § 6–1–103. In doing so, the Attorney General "may issue subpoenas to require the attendance of witnesses ... as may be necessary to administer the provisions of this article." § 6–1–108(1). But as the trial court observed, the CCPA does not require the Attorney General to elicit testimony from every consumer who was harmed to prove a violation.

¶ 37 In *May Dep't Stores Co.*, a CCPA violation was found based on testimony from fewer than all of the consumers adversely affected. There, the department store was found to have violated the CCPA through deceptive advertising. 863 P.2d at 972. Although the advertising occurred over a three-year period, at trial, only four consumers testified that they had been deceived.

¶ 38 The supreme court explained that the State need not prove actual consumer injury to establish a CCPA violation:

If the CCPA required some consumer injury or involvement, the state would be forced to wait until consumers were victimized before it could seek complete relief. A policy of tolerating false advertising until a customer was actually injured would contradict the mandatory nature of the civil penalty required for each violation and would ignore the plain language and broad remedial purposes of the CCPA.

*Id.* at 973. Thus, if the Attorney General chooses to proceed at trial with fewer witnesses than all of the consumers who were harmed, the question is whether the evidence was sufficient to prove a CCPA violation.

¶ 39 As to sufficiency, the trial court found a CCPA violation as follows:

[T]he representative [borrowers] demonstrated a pattern involving various aspects of deceptive trade practices.... Specifically, they demonstrate initiating contact with advertisements of a particular type of loan (fixed rate for a term of years as opposed to an option ARM), convincing the consumer or otherwise not disclosing to the consumer the actual terms and nature of the loan, and closing on a loan different than expected by the consumer....

The State, therefore, has demonstrated by a preponderance of the evidence that [defendant] ... conducted deceptive trade practices....

The Court finds that the advertisements were relied upon by the [borrowers] and were misleading, that the representation made to them were material and led to the enticement of the consumers to enter the loans, and that the undisclosed information was material to the consumers' decision to sign the loans. Finally, the Court finds that [defendant] had the required knowledge and motive ... throughout the process.

The summary of the representative witnesses' testimony in the Order of Judgment supports the findings. And defendant's failure to designate the trial transcript precludes review of the testimony of those witnesses.

Under C.A.R. 10(b),

If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion.

"[R]equiring the appellant to designate all of the relevant evidence in a sufficiency case ... ensures that the appellate court has access to the portions of the record it needs to apply the standard of review." *Northstar Project Mgmt., Inc. v. DLR Grp., Inc.*, 2013 CO 12, ¶ 14, 295 P.3d 956. Where a defendant failed to "include in the record a transcript of *all evidence relevant to*" the court's judgment, *id.* at ¶ 13 (emphasis in original),

sufficient support for the judgment is presumed, *id.* at ¶ 17.

¶ 40 Accordingly, we decline to disturb the trial court's finding that defendant violated the CCPA.

## VI. Affidavits

¶ 41 Defendant next contends the trial court erred by admitting the affidavits of borrowers who did not testify at trial. We conclude that the affidavits should not have been admitted.

### A. Background

¶ 42 Before trial, the Attorney General moved to introduce at trial "affidavits and documentary evidence" from non-testifying borrowers. He argued that admitting the affidavits would "serve the interests of judicial economy and allow the State to litigate the merits of this case in a reasonable manner." He explained,

> To require the State to present testimonial evidence from each and every affected consumer, individually, would be unnecessary and unreasonably burdensome and cumulative. It would also frustrate the State's efforts to enforce consumer protection laws in this lawsuit given the scope of the alleged unlawful conduct.

¶ 43 Defendant responded that such affidavits constituted hearsay and their admission would preclude him from questioning non-testifying borrowers to establish that they had not been harmed. The trial court concluded:

> While court testimony of every allegedly harmed witness to establish damages and penalties would be contrary to the purpose of the CCPA, which promotes prompt, economical remedies, Plaintiff's proposed affidavits and accompanying objective documentary evidence to prove such remedies would deprive Defendants of their due process. The equitable solution to account for judicial economy, the purpose of the CCPA, and Defendants' due process interests is to allow depositions to be taken of all non-testifying consumer witnesses.

¶ 44 Shortly before trial, defendant moved to strike the affidavits, arguing that the At-

torney General had failed to disclose them during discovery. In his trial brief, defendant also argued that even if disclosure had been timely, the affidavits should be excluded because they constituted inadmissible hearsay.

¶ 45 The new judge to whom the case had been assigned declined to strike the affidavits. He explained that the first judge had set forth "a procedure in which it told, in essence, the Attorney General that they could proceed evidentiary wise with such disclosures or affidavits concerning non-testifying witnesses," and found that the Attorney General had "proceeded according[ly]." This judge also found that the non-testifying borrowers' "identity and possibility for a deposition was available to [defendant]," even though "[t]he affidavits themselves may have been provided after the discovery cutoff." The judge did not address defendant's hearsay argument, but noted that "each one of these affidavits is subject to all evidentiary concerns at their submission at trial."

### B. The First Judge's Order

¶ 46 We reject defendant's argument that the affidavits should have been stricken because the Attorney General failed to comply with the first judge's order.

¶ 47 Rulings concerning discovery and pretrial disclosure are reviewed for an abuse of discretion. *See Payan v. Nash Finch Co.*, 2012 COA 135, ¶ 60, 310 P.3d 212.

¶ 48 The first judge's order allowed for "depositions to be taken of all non-testifying consumer witnesses." The record shows that:

- In May 2008, the Attorney General's initial Rule 26 disclosures identified forty-six potential borrower witnesses.
- In March 2009, the Attorney General's Rule 26 disclosure on economic damages identified the thirty-eight borrowers for whom he would be seeking restitution and disgorgement.
- In April 2009, the Attorney General moved the court to allow affidavits from any borrowers who did not testify. The motion indicated that one of the thirty-

eight borrowers had been removed from the list.

- In October 2009, the Attorney General identified twenty borrowers as "will call" witnesses.
- Shortly after discovery closed in December 2010, and approximately three weeks before trial, the Attorney General produced the affidavits.

¶ 49 Thus, by comparing these lists defendant could have determined which borrowers would not be testifying and deposed them in advance of the discovery cut-off. He did not do so. Contrary to defendant's implication, the court's order did not provide any directions about the affidavits, such as a date by which the Attorney General was required to provide them. Although such details could have been helpful, defendant did not seek clarification of the court's order. Nor did he seek to reopen discovery for purposes of testing the affidavits by depositions.

¶ 50 Therefore, we discern no abuse of discretion in the second judge's conclusion that the Attorney General complied with the order by identifying the non-testifying complainants at a time when defendant still had an opportunity to depose them.

### C. The Affidavits

■ ¶ 51 Alternatively, defendant argues that notwithstanding the court's order allowing for depositions, affidavits of those borrowers who did not testify at trial constituted inadmissible hearsay. We agree.

■ ¶ 52 Evidentiary rulings are reviewed for an abuse of discretion, meaning they "are reversible only if they are manifestly arbitrary, unreasonable, or unfair." *Chavez v. Parkview Episcopal Med. Ctr.*, 32 P.3d 609, 611 (Colo.App.2001).

¶ 53 Whether to treat this issue as unpreserved is a close question. On the one hand, because defendant failed to designate any trial transcript, we cannot determine whether he renewed his hearsay objection during trial. On the other hand, for several other issues, the Attorney General argues that lack of a transcript precludes review. But the Attorney General does not make this argument concerning the hearsay objection to the affidavits, and instead argues the merits of the hearsay issue. Also, some overlap exists between the due process issue, which was resolved before trial, and the hearsay issue, which was not. *See* CRE 103(a)(2).

¶ 54 Therefore, we decline to take up sua sponte whether defendant's pretrial filings sufficiently preserved the hearsay issue. *See Roberts v. Am. Family Mut. Ins. Co.*, 144 P.3d 546, 550 (Colo.2006) (appellate court has "discretion to notice any error appearing of record, whether or not a party preserved its right to raise or discuss the error on appeal").

### 1. Opportunity to Depose Affiants

■ ¶ 55 "A civil litigant's right to due process of law includes the right to cross-examine witnesses and to have an opportunity for rebuttal." *Aspen Props. Co. v. Preble*, 780 P.2d 57, 58 (Colo.App.1989). Hearsay is an out of court statement offered into evidence for the truth of the matter asserted. CRE 801. It is inadmissible unless an exception applies. CRE 802. But where an exception applies, in civil proceedings "[d]ue process requires only that the evidence be reliable, and reliability can be inferred without more in a case where evidence falls within a firmly rooted exception to the hearsay rule." *Cabinet for Health & Family Servs. v. A.G.G.*, 190 S.W.3d 338, 346 (Ky.2006) (internal quotation marks omitted).

¶ 56 The Attorney General cites no case, nor have we found one in Colorado, allowing the admission of affidavits from non-testifying declarants merely because the adverse party had the opportunity to depose them. Admission on this basis would contradict the broad prohibition in CRE 802. And "the Colorado Rules of Evidence permit no such case-law exception to the general prohibition against the admissibility of hearsay evidence." *People v. Rosenthal*, 670 P.2d 1254, 1256–57 (Colo.App.1983). Therefore, to the extent either trial judge held that a mere opportunity to depose a declarant makes the declarant's affidavit admissible at trial, absent a hearsay exception, the holding was an abuse of discretion. *See Genova v. Longs Peak Emergency Physicians, P.C.*, 72 P.3d

454, 458 (Colo.App.2003) (a court abuses its discretion when its decision rests on a misunderstanding or misapplication of the law).

### 2. CRE 807

¶ 57 Alternatively, the Attorney General argues that the affidavits were admissible under CRE 807. We disagree.

¶ 58 The Attorney General concedes that he raised CRE 807 for the first time in opposing defendant's post-trial motion. Even so, this issue is properly before us because "[w]e can affirm for any reason supported by the record, even reasons not decided by the trial court." *Roque v. Allstate Ins. Co.*, 2012 COA 10, ¶ 7, 318 P.3d 1.

¶ 59 Under CRE 807, also known as the residual hearsay exception, "a statement that would otherwise be excluded as hearsay may be allowed" if it meets certain prerequisites. *People v. Preciado–Flores*, 66 P.3d 155, 164 (Colo.App.2002). Those prerequisites are:

> the statement is supported by circumstantial guarantees of trustworthiness; the statement is offered as evidence of material facts; the statement is more probative on the points for which it is offered than any other evidence which could be reasonably procured; the general purposes of the rules of evidence and the interests of justice are best served by the admission of the statement; and the adverse party had adequate notice in advance of trial of the intention of the proponent of the statement to offer it into evidence.

*People v. Fuller*, 788 P.2d 741, 744 (Colo. 1990). However, this exception is "to be used only rarely, and in exceptional circumstances and applies only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *United States v. Turner*, 718 F.3d 226, 233 (3d Cir.2013) (internal quotation marks and alterations omitted).[3]

¶ 60 A trial court "must make adequate findings on the record before admitting hearsay statements under the residual exception." *Vasquez v. People*, 173 P.3d 1099,

1106 (Colo.2007). Here, because the Attorney General did not raise CRE 807 until post-trial motions, the trial court could not have made any such findings during trial. Nor did it do so in denying defendant's post-trial motion. This lack of findings, however, does not preclude our review, unlimited by deference to trial court discretion.

¶ 61 Appellate courts may analyze "the admissibility of hearsay statements under [the residual hearsay exception] in cases in which trial courts failed to make on-the-record findings, or based their rulings on other grounds." *Fuller*, 788 P.2d at 745; *see also Fed. Trade Comm'n v. Figgie Int'l, Inc.*, 994 F.2d 595, 608 (9th Cir.1993) ("In the absence of such findings [on the residual hearsay exception], an appellate court may review the record to determine if the prerequisites to admissibility have been met."). Doing so here, we conclude that the affidavits were not admissible under CRE 807.

¶ 62 The affidavits satisfy two of the CRE 807 prerequisites. They were offered as evidence of material facts beyond the affiants' damages—defendants' alleged deceptive statements to consumers and advertising. And although discovery was closed when defendants first received copies of the affidavits, sufficient time remained before trial during which defendant could have interviewed the affiants, all of whom were Colorado residents. He also could have subpoenaed them for trial, because they were on the Attorney General's may call witness list. But the remaining prerequisites are problematic at best.

¶ 63 Defendant primarily argues the absence of circumstantial guarantees of trustworthiness, emphasizing the affiants' economic interest. Among the factors used to determine trustworthiness are:

> 1) the nature and character of the statement; 2) the relationship of the parties; 3) the motivation of the declarant; 4) the circumstances under which the statement was made; 5) the knowledge and qualifications of the declarant; 6) the existence or lack of corroboration; and 7) the availabili-

---

**3.** Fed.R.Evid. 807 is substantially similar to CRE 807. *See People v. Warrick*, 284 P.3d 139, 143

(Colo.App.2011) (federal case law persuasive in interpreting Colorado Rules of Evidence).

ty of the declarant at trial for cross-examination.

*Abdelsamed v. N.Y. Life Ins. Co.*, 857 P.2d 421, 426–427 (Colo.App.1992), *rev'd on other grounds, Hock v. N.Y. Life Ins. Co.*, 876 P.2d 1242 (Colo.1994). In *Hock*, the court pointed out that the hearsay declarant, "had no interest in the outcome of this lawsuit and we can find no significant motive that [the declarant] might have had to benefit Abdelsamed by lying." 876 P.2d at 1255. Here, the question of trustworthiness is close.

¶ 64 On the one hand, the affidavits were made under oath, they are partly verifiable from transactional documents, the affiants were recounting matters of personal experience, and testifying borrowers recounted similar experiences. *See, e.g., Fed. Trade Comm'n v. Kuykendall*, 312 F.3d 1329, 1343 (10th Cir.2002) (consumer declarations and complaints "had circumstantial guarantees of trustworthiness as all were made under oath subject to penalty of perjury"); *Figgie Int'l*, 994 F.2d at 608 (consumer complaint letters possessed guarantees of trustworthiness where they "all reported roughly similar experiences"); *Fed. Trade Comm'n v. Amy Travel Serv., Inc.*, 875 F.2d 564, 576 (7th Cir.1989) (affidavits "possess sufficient guarantees of trustworthiness" where "made under oath subject to perjury penalties and the affiants describe facts about which they have personal knowledge—their contacts with defendants").

¶ 65 On the other hand, the following factors raise serious concerns about trustworthiness:

- The affiants knew that litigation was pending. *See Fed. Trade Comm'n v. E.M.A. Nationwide, Inc.*, No. 1:12–cv–2394, 2013 WL 4545143, at *2 (N.D.Ohio Aug. 27, 2013) (excluding consumer complaints under Rule 807 where "the complaints list events that, perhaps not created in anticipation of litigation, were created with knowledge that litigation was possible").
- The affiants stood to receive substantial restitution based on their affidavits. *Compare Figgie Int'l*, 994 F.2d at 608 (consumer complainants "had no motive to lie to the FTC regarding the price

they paid for their heat detectors"), *with E.M.A. Nationwide*, 2013 WL 4545143, at *2 ("consumers often made the complaints with hopes of receiving some type of refund or other financial benefit").

- The affidavits were not written spontaneously or independently, but were obtained by representatives of the Attorney General's office. *See Iams Co. v. Nutro Prods., Inc.*, No. C–3–00–566, 2004 WL 5780001, at *5 (S.D.Ohio July 26, 2004) (mystery shopper reports were unlike the complaint letters in *Figgie Int'l*, 994 F.2d at 608, which "were sent independently to the FTC from unrelated members of the public").
- The Attorney General's office procured the affidavits to further its position in the litigation. *See Fed. Trade Comm'n v. Wash. Data Res.*, No. 8:09–cv–2309–T–23TBM, 2011 WL 2669661, at *5 (M.D.Fla. July 7, 2011) ("[T]he declarations proffered by the Commission derive from the Commission's contacting certain consumers and procuring a declaration for the purpose of litigation.").

¶ 66 As to the remaining factors, "other evidence which could be reasonably procured" partly overlaps "the interests of justice," because imposing an unreasonable requirement would frustrate the interests of justice and the purposes of the CCPA. *See W. Food Plan, Inc.*, 198 Colo. at 256, 598 P.2d at 1041. As so viewed, these factors also weigh against admitting the affidavits:

- Only twenty affidavits were offered. *See Fed. Trade Comm'n v. U.S. Mortg. Funding, Inc.*, No. 11–cv–80155, 2011 WL 2784466, at *2 (S.D.Fla. July 12, 2011) ("It would be unreasonable for the FTC to call 296 separate witnesses to testify to the facts set forth in the consumer complaints.").
- As Colorado residents, all of the affiants could have been deposed by the Attorney General, and because many of them resided in the Denver metropolitan area, their attendance at depositions would not have imposed undue inconvenience on most of them. *See Amy Travel Serv., Inc.*, 875 F.2d at 576 ("The defendants ran a nation-wide telemarketing opera-

tion and it would be cumbersome and unnecessarily expensive to bring all the consumers in for live testimony.").

● For the same reasons, the Attorney General could have subpoenaed them to appear at trial.

● Requiring testimony from a claimant, either through a deposition or at trial, involves added pretrial expense or increase in trial time. But here, the cost of twenty pretrial depositions is not disproportionate to the amount of recovery sought, which totaled $641,751.58 for restitution and $3,066,804.62 for disgorgement. *See Figgie Int'l,* 994 F.2d at 609 ("It should not be necessary to scale the highest mountains of Tibet to obtain a deposition for use in a $500 damage claim." (internal quotations marks omitted)). Nor is lengthening the trial, which ran three and one-half weeks and must have included at least the twenty-four will-call witnesses identified by the Attorney General before trial, disproportionate to these amounts.

¶ 67 As to proportionality, the amounts allowed to be established by affidavit in *Fed. Trade Comm'n v. Kitco of Nev., Inc.,* 612 F.Supp. 1282, 1295 (D.Minn.1985), on which the Attorney General relies, were within the range of the amounts set forth in the affidavits here. But in that case, the non-testifying witnesses came "from all parts of the United States." *Id.* This explains the court's conclusion that it would be "too expensive and time consuming to call [such] witnesses ... merely to establish total consumer injury or even to take each consumer's deposition." *Id.*

¶ 68 The Attorney General has not cited a case, nor have we found one, admitting affidavits from less than two dozen affiants, where all of them lived in the same state, and many in the same vicinity, where the trial occurred. Thus, balancing the amounts sought on behalf of the affiants against the relative burden of obtaining their depositions or live testimony does not show that the interests of justice required admitting the affidavits.

¶ 69 Accordingly, weighing concerns over circumstantial guarantees of trustworthiness and the limited burden of deposing or obtaining live testimony from twenty affiants against the caution that this hearsay exception be used rarely, we conclude that the affidavits were not admissible under CRE 807.

### D. Remedy

¶ 70 The trial court did not rely on the affidavits in finding that any violations had occurred. Nor did the court rely on the affidavits to determine the amount of civil penalties. But it found that the affidavits were relevant "to determine [the] remedy" for defendant's violations of the CCPA. Thus, our conclusion that the affidavits are inadmissible affects only restitution and disgorgement.

¶ 71 As to restitution, the Attorney General sought specific amounts for each borrower "who entered into ... loans transacted or brokered by defendants." The amount of restitution sought for borrowers who did not testify was supported only by the affidavits and attached to transactional documents. However, because we have concluded that the affidavits are inadmissible, the restitution amounts for these borrowers must be set aside.

¶ 72 Similarly, in calculating disgorgement, the trial court relied on "the actual consumer complaints ... offered to the court through deposition, testimony *and affidavit.*" (Emphasis added.) But to the extent those complaints were offered for non-testifying borrowers through the affidavits, the court should not have considered them. Thus, disgorgement must also be reduced by those amounts established through the affidavits.

¶ 73 Accordingly, we vacate these awards and remand for the court to recalculate damages consistent with this opinion.

### VII. Statute of Frauds

¶ 74 Defendant next contends the trial court's restitution award was barred by the credit agreement statute of frauds, section 38–10–124, C.R.S.2013. We conclude that this statute does not apply.

### A. Preservation and Standard of Review

¶ 75 Defendant preserved this issue by raising the statute of frauds as an affirmative defense. We review the trial court's interpretation of a statute de novo. *Fisher v. 1st Consumers Funding, Inc.*, 160 P.3d 321, 323 (Colo.App.2007).

### B. Law

¶ 76 The credit agreement statute of frauds provides that notwithstanding any statutory or case law to the contrary, "no debtor or creditor may file or maintain an action or a claim relating to a credit agreement involving a principal amount in excess of twenty-five thousand dollars unless the credit agreement is in writing and is signed by the party against whom enforcement is sought." § 38–10–124(2). But it "applies [only] to claims relating to credit agreements between debtors and creditors." *Fisher*, 160 P.3d at 324; *see also* § 38–10–124(1)(b) (a creditor means "a financial institution which offers to extend, is asked to extend, or extends credit under a credit agreement with a debtor"); § 38–10–124(1)(c) (a debtor means "a person who or entity which obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor").

### C. Application

¶ 77 Defendant argues that section 38–10–124 precludes the court's restitution award because the Attorney General calculated restitution based on alleged oral agreements whereby defendant promised consumers loans with different terms than those in the executed loan documents. This argument fails because its premise—the existence of a debtor-creditor relationship between defendant and the consumers—is incorrect. Thus, section 38–10–124 does not apply.

¶ 78 In *Fisher*, the division held that a "mortgage broker is not a financial institution which offers to extend or extends credit under a credit agreement, and is thus not a creditor pursuant to § 38–10–124." 160 P.3d at 324. It explained that a mortgage broker is one "who negotiates, originates, or offers or attempts to negotiate or originate for a borrower, and for a commission or other thing of value, a loan to be consummated and funded by a mortgage lender." *Id.* (internal quotation marks omitted).

¶ 79 Here, the trial court found that defendant "secured lines of credit needed to get loans for the scheme and brokered loans for the consumers." Defendant does not cite any authority contrary to *Fisher* that such actions meet the definition of creditor under section 38–10–124. Nor does defendant argue that he used his own funds or "ever offered to extend or actually extended credit." *Id.*

¶ 80 Accordingly, because defendant was not a creditor, we conclude that section 38–10–124 does not bar the trial court's restitution award.

## VIII. Restitution Calculation

¶ 81 Defendant next contends the formula used by the trial court to calculate restitution—the difference between the loan terms as promised and those actually provided, over the life of the loan—awarded contractual "expectancy damages," which was improper because he was not a party to any consumer's loan agreement. We discern no basis for reversal.

### A. Preservation and Standard of Review

¶ 82 Defendant preserved this issue when he objected pretrial to the Attorney General's restitution remedy, and renewed his argument in his post-trial motion. *Cf. Schuessler v. Wolter*, 2012 COA 86, ¶ 49, 310 P.3d 151 ("The record is clear that [defendant] adequately raised the issue in its evidentiary presentation, in its closing argument, and in its motion for new trial.").

¶ 83 A trial court enjoys broad discretion in fashioning appropriate remedies under the CCPA. *May Dep't Stores Co.*, 863 P.2d at 980. But to the extent our review of such remedies requires statutory interpretation, we do so de novo. *Id.*

### B. Law

¶ 84 Section 6–1–110(1) provides:

The court may make such orders or judgments as may be necessary to prevent the use or employment by such person of any

such deceptive trade practice or which may be necessary to completely compensate *or* restore to the original position of any person injured by means of any such practice *or* to prevent any unjust enrichment by any person through the use or employment of any deceptive trade practice.

(Emphasis added.) Under the CCPA, the term "restitution" refers "solely to a district court's orders or judgments ... which may be necessary" to completely compensate or restore to the original position any person injured or to prevent any unjust enrichment. *W. Food Plan, Inc.,* 198 Colo. at 254 n. 1, 598 P.2d at 1039 n. 1 (internal quotation marks omitted). Defendant cites no Colorado authority, nor have we found any, analyzing relief under the CCPA in terms of expectancy damages.

### C. Analysis

¶ 85 In the Order and Judgment, the trial court explained that it awarded restitution based on "a simple mathematical calculation which compared the rates promised with the ones given and the difference thereof over the life of the relevant period of affect." And in denying defendant post-trial relief, the court explained that the calculation was "reasonably done to account for the losses suffered by consumers." Defendant's failure to designate the transcript requires us to assume that the evidence supports these statements.

¶ 86 Nevertheless, defendant argues that the court's formula is inapplicable because he did not make loans to any consumers. This assertion ignores the trial court's detailed findings that defendants acted in concert. It also ignores the plain language of section 6–1–110(1), which allows for orders and judgments necessary "to completely compensate" injured persons, among other enumerated remedies. *See May Dep't Stores Co.,* 863 P.2d at 976 ("The legislature's· use of the disjunctive 'or' demarcates different categories." (alterations and some internal quotation marks omitted)). And "completely" suggests a broader range of relief than the common law definition of restitution. *See Wagner Mobil, Inc. v. City of Madison,* 190 Wis.2d 585, 527 N.W.2d 301, 304 (1995)

("Webster's Third New International Dictionary 464 (1986) defines 'completely' in terms of 'being complete: fully, entirely.' ").

¶ 87 Further, "[w]here the amount of the recovery may reasonably be measured in different ways, the choice is within the discretion of the trial court." *Redd Iron, Inc. v. Int'l Sales & Servs. Corp.,* 200 P.3d 1133, 1136 (Colo.App.2008). Here, based on the evidence summarized in the Order and Judgment, and without a transcript, the trial court's use of a benefit of the bargain approach to restitution appears to be a reasonable method for compensating the injured consumers.

¶ 88 Accordingly, we conclude that the trial court's formula for calculating restitution was within its discretion under section 6–1–110. As held in Part V above, however, the calculation cannot be applied to consumers whose injury was proven only by affidavit.

### IX. Civil Penalties

¶ 89 Defendant next contends the trial court's findings related to civil penalties were inadequate. We conclude that the findings are sufficient.

### A. Preservation and Standard of Review

¶ 90 Defendant was not required to take any action to preserve this issue. *See* C.R.C.P. 52 ("Neither requests for findings nor objections to findings rendered are necessary for purposes of review."). Because, as discussed below, the adequacy of a trial court's findings, as contrasted with the sufficiency of the evidence to support them, is tested by whether an appellate court can discern the lower court's rationale, we will review adequacy de novo. *See Shar's Cars, LLC v. Elder,* 2004 UT App 258, ¶ 12, 97 P.3d 724 ("Questions about the legal adequacy of findings of fact and the legal accuracy of the trial court's statements present issues of law, which we review for correctness, according no deference to the trial court." (internal quotation marks omitted)).

### B. Law

¶ 91 "In all actions tried upon the facts without a jury[,] ... the court shall find the

facts specially and state separately its conclusions of law...." C.R.C.P. 52. "The purpose of the rule is to give the appellate court a clear understanding of the grounds for the trial court's decision." *Gitlitz v. Bellock,* 171 P.3d 1274, 1278 (Colo.App.2007). The trial court has satisfied this requirement "if the ultimate facts have been determined and conclusions of law are entered thereon." *Manor Vail Condo. Ass'n v. Town of Vail,* 199 Colo. 62, 68, 604 P.2d 1168, 1172 (1980). And "although [the findings] are brief and sparse in detail," the appellate court may be "able to determine from the findings and conclusions the basis of the court's judgment for the purposes of review." *Id.* Defendant does not argue that the CCPA imposes a higher standard, nor have we found a case so holding.

¶ 92 Under CCPA section 6–1–112(1)(a):

Any person who violates or causes another to violate any provision of this article shall forfeit and pay to the general fund of this state a civil penalty of not more than two thousand dollars for each such violation. For purposes of this paragraph (a), a violation of any provision shall constitute a separate violation with respect to each consumer or transaction involved....

The version applicable to this action capped civil penalties at $100,000. If the violation was committed against an elderly person, the maximum per violation penalty increases from $2,000 to $10,000. § 6–1–112(3).

### C. Application

¶ 93 Here, the trial court awarded the maximum statutory penalty of $100,000. The court reasoned that it could assess civil penalties "on every transaction involved, on any consumer involved or both. By transaction involved, the Court is not limited by whether a transaction involved consumer injury." Citing *May Dep't Stores Co.,* it found that "the civil penalties far exceed $100,000." Alternatively, it found that even if it considered only "the testifying consumers and the ads directly testified about ... it finds itself against the cap." These findings satisfy C.R.C.P. 52 because we are able to determine the basis for the court's judgment.

¶ 94 Defendant also argues that "the court failed to link any particular violation to any particular consumer or transaction ... and further failed to state the amount of penalty for any such violation." His argument is unpersuasive, for the following reasons.

¶ 95 The court found that "[t]he State presented evidence of 549 ads taken out by various persons or entities connected to the Defendants," and that "[d]irect evidence was received concerning approximately 20 ads." The Order of Judgment identified thirteen representative consumers, twelve of whom testified to having seen such ads, according to the court's summary of their testimony. As to all ads, the court found that defendant "knowingly advertised loan products which either misled consumers to believe that they were fixed rate term loans when they were not or advertised low or no closing costs." In the absence of a transcript, we must assume that the record supports these findings.

¶ 96 Thus, applying the court's stated rationale to the evidence described in the Order of Judgment and to the exhibits in the record, the bases on which the court could have reached the $100,000 penalties cap are supported by the CCPA and *May Dep't Stores Co.,* 863 P.2d at 975–76 ("We therefore affirm the court of appeals holding the term transaction to mean 'one ad in one media outlet per day.'").

¶ 97 Defendant further argues that the findings are insufficient because the court did not apply the following factors, identified in *State ex rel. Woodard v. May Dep't Stores Co.,* 849 P.2d 802, 810 (Colo.App.1993), *aff'd in part, rev'd in part, May Dep't Stores Co.,* 863 P.2d 967:

(a) the good or bad faith of the defendant;

(b) the injury to the public;

(c) the defendant's ability to pay; and

(d) the desire to eliminate the benefits derived by violations of the CCPA.

While these factors may be helpful to parties and trial courts in dealing with civil penalties, we decline to treat them as a litmus test for the adequacy of findings because:

- The factors have no support in the statute;

- The division cited only out-of-state authority;

- *May Dep't Stores Co.* has never been cited for this proposition; and
- It was reversed in part by our supreme court, which did not adopt these factors. *See May Dep't Stores Co.*, 863 P.2d at 981.

¶ 98 Defendant's final attack on the findings for "failure to articulate the burden of proof it applied to the civil penalties award" also fails. The court applied the "preponderance of the evidence" test. This is the presumptive standard for civil actions, section 13–25–127(1), C.R.S.2013, and the CCPA does not impose a heavier burden.

¶ 99 Defendant suggests that a heavier burden should have been applied by analogizing civil penalties to punitive damages, which must be proven beyond a reasonable doubt. *See* § 13–21–102, C.R.S.2013. But the CCPA refers to "civil penalties," not punitive damages. Defendant cites no authority, nor have we found any, equating statutory civil penalties with punitive damages recoverable in private tort actions.

¶ 100 Our supreme court rejected a similar argument in *Farmers Grp., Inc. v. Williams,* 805 P.2d 419, 427 (Colo.1991) ("The court [of appeals] said '[t]here is a distinction between the assessment of a statutory civil penalty and for exemplary damages.' We agree." (citation omitted)). In *Williams,* the court distinguished between the mandatory penalty under former section 10–4–708 (repealed),[4] and the discretionary nature of awarding punitive damages under section 13–21–102. Similarly, here, mandatory language appears in CCPA section 6–1–112(1) concerning civil penalties.[5]

¶ 101 Accordingly, we discern no deficiency in the findings concerning the civil penalties award.

## X. Setoff

¶ 102 Defendant next contends the trial court erred by concluding that he was not entitled to a setoff for the amount paid by Johnson in settlement. We agree with the trial court.

### A. Preservation and Standard of Review

¶ 103 Defendant raised this issue in his post-trial motion for a setoff against the court's restitution and disgorgement awards. Whether a defendant in a CCPA action brought by the Attorney General is entitled to a setoff for the settlement proceeds of a codefendant is a question of law subject to de novo review. *Cf. Lee v. Royal Indem. Co.,* 108 F.3d 651, 653 (6th Cir.1997).

### B. Background

¶ 104 Before trial, the Attorney General reached a settlement in which all claims against Johnson were dismissed and he paid one million dollars. After the trial court entered restitution and disgorgement amounts, defendant argued that he was entitled to a setoff based on Johnson's settlement. In so arguing, he relied only on section 13–50.5–105(1)(a), C.R.S.2013, of the Uniform Contribution Among Tortfeasors Act, which provides for the setoff of settlement payments by one tortfeasor from damages awarded against other tortfeasors who have been held liable for the same injury. The court denied defendant's request, finding that this statute was not "applicable to this enforcement action as no damages were awarded by the Court."

### C. Analysis

¶ 105 Under section 13–50.5–105:

(1) When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury ...:

(a) It does not discharge any of the other tortfeasors from liability for their several pro rata shares of liability for the injury ... or loss unless its terms so provide; but

---

4. Ch. 203, sec. 1, § 10–4–708(1.8), 1991 Colo. Sess. Laws 1187.

5. Out-of-state authority is in accord. *See, e.g., State v. Hagen,* 840 N.W.2d 140, 150 (Iowa 2013) ("But the purposes of punitive damages and civil tax penalties differ, suggesting that the civil penalties do not fall within this statutory term."); *Vanderbilt Mortg. & Fin., Inc. v. Cole,* 230 W.Va. 505, 740 S.E.2d 562, 569 (2013) ("Although our Court has never expressly stated that civil penalties are not punitive damages, such is apparent in our case law.").

it reduces the aggregate claim against the others to the extent of any degree or percentage of fault or negligence attributable by the finder of fact, *pursuant to section 13–21–111(2) or (3) or section 13–21–111.5,* to the tortfeasor to whom the release or covenant is given. . . .

(Emphasis added.) Sections 13–21–111 and 13–21–111.5 set forth the amount of damages recoverable in tort cases. *See Reid v. Berkowitz,* 2013 COA 110, ¶ 27, 315 P.3d 185 (under section 13–21–111.5 "a tortfeasor should pay only for the portion of the injury that he or she caused").

¶ 106 By contrast, under the CCPA, tort damages are not recoverable by the Attorney General. *See* § 6–1–113; *see also W. Food Plan, Inc.,* 198 Colo. at 256, 598 P.2d at 1041 (under the CCPA, the Attorney General must "determine which of several enforcement devices he should set in motion, after having become convinced that violations of the Act have occurred" (internal quotation marks omitted)); *Coors v. Sec. Life of Denver Ins. Co.,* 91 P.3d 393, 398 (Colo.App.2003) (CCPA "provides both for enforcement by the attorney general and for a private right of action by any person injured by the deceptive acts or practices committed by a business"). Instead, the Attorney General's enforcement mechanisms include injunctions, civil penalties, restitution, and disgorgement. *See* § 6–1–110.

¶ 107 These mechanisms do not merely compensate consumers, as would tort damages. The CCPA "serves more than a merely restitutionary function. A primary purpose of the CCPA is to deter and punish deceptive trade practices." *In re Jensen,* 395 B.R. 472, 486 (Bkrtcy.D.Colo.2008) (internal quotation marks omitted). In bringing a CCPA action, the Attorney General's interest is "in deterrence, punishment, and protection of the public at large, rather than the victim's desire for compensation." *Id.* (internal quotation marks omitted).

¶ 108 Although "restitution is measured by the amount of damage caused to consumers, the State's goal in collecting it is to enforce the State's consumer protection laws and to

punish violations thereof." *Id.* at 484–85 (explaining that while the State "may ultimately use" restitution to compensate injured consumers, nothing in the CCPA requires it). Similarly, "[d]isgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating . . . laws by making violations unprofitable." *Sec. & Exch. Comm'n v. J.T. Wallenbrock & Assocs.,* 440 F.3d 1109, 1113 (9th Cir.2006) (internal quotation marks omitted) (defendant required to disgorge the entire amount by which he was unjustly enriched, even though he also had been ordered to pay more than $145 million in restitution to his victims as part of a separate criminal action); *see also Jensen,* 395 B.R. at 485 (discussing the penal nature of disgorgement even if under CCPA the State "may ultimately use the disgorged funds to compensate . . . customers").

¶ 109 Accordingly, because the Attorney General is not recovering tort damages under the CCPA, we agree with the trial court that defendant is not entitled to a setoff under section 13–50.5–105(1)(a).[6]

## XI. Attorney Fees

¶ 110 Defendant next contends the trial court erred by awarding the Attorney General attorney fees of $1,428,515.50. We discern no abuse of discretion.

### A. Preservation and Standard of Review

¶ 111 Defendant preserved this issue by opposing the Attorney General's motion for attorney fees. We review the amount of an attorney fees award for abuse of discretion. *Hartman v. Cmty. Responsibility Ctr., Inc.,* 87 P.3d 254, 257 (Colo.App. 2004). A court abuses its discretion when the fees award is patently erroneous and unsupported by the evidence. *Tallitsch v. Child Support Servs., Inc.,* 926 P.2d 143, 147 (Colo.App.1996).

### B. Law

¶ 112 Under section 6–1–113(4), "attorney fees shall be awarded to the attorney general . . . in all actions where the attorney general . . . successfully enforces this article." De-

6. We express no opinion on defendant's right, if any, to a setoff under common law principles.

fendant does not dispute the Attorney General's entitlement to attorney fees, but challenges only the amount awarded.

¶ 113 In awarding attorney fees, a court should first determine a lodestar amount by estimating the hours reasonably expended for the litigation and multiplying that number by a reasonable hourly rate. *Carruthers v. Carrier Access Corp.*, 251 P.3d 1199, 1211 (Colo.App.2010). The court may then adjust this amount based on the factors in Colo. RPC 1.5, including the experience, reputation, and ability of the lawyer or lawyers performing the services, and the complexity of the case. *See Tallitsch*, 926 P.2d at 147.

### C. Analysis

¶ 114 We reject defendant's arguments as follows.

¶ 115 Defendant argues that the attorney fees award was unreasonable because it exceeded the amount in controversy. But the award did not exceed the amount of restitution, disgorgement, and civil penalties sought. And the amount in controversy is only one factor for the court to consider in awarding fees. *See id.* at 147; *see also Westec Constr. Mgmt. Co. v. Postle Enters. I, Inc.*, 68 P.3d 529, 536 (Colo.App.2002) (fact that plaintiff's postjudgment attorney fees exceeded the difference between the amount of its original judgment and that of its recovery on appeal and remand was not sufficient to demonstrate that the award was unreasonable).

¶ 116 Other factors include complexity and length of time. Here, the court found that defendant "greatly contributed to the inflation of time and effort necessary to resolve this matter"; and that "the case was and became more complex and was litigated aggressively by [defendant]." The trial court is in the best position to evaluate complexity. *See Payan*, ¶ 39. And in any event, without a transcript, we cannot independently determine either the complexity of the case or defendant's contribution to that complexity.

¶ 117 Defendant argues that the Attorney General "characterized the case as complicated and long" and charged "time that it did not need to spend on the case." But defendant provided no specific examples of alleged overcharging by the Attorney General. *See Madison Capital Co., LLC v. Star Acquisition VIII*, 214 P.3d 557, 561 (Colo.App.2009) ("The arguments of counsel raised in . . . opposition cannot be viewed as evidence to rebut . . . reasonableness."). And, as indicated, we defer to the trial court's assessment of complexity.

¶ 118 Defendant argues that the hourly rates requested by the Attorney General were unreasonably based on private attorney rates, but cites no supporting Colorado authority. In *Balkind v. Telluride Mountain Title Co.*, 8 P.3d 581, 588 (Colo.App.2000), the division rejected this argument, explaining that "[s]alaries paid to government attorneys do not reflect the true cost of the services they render" and an attorney fees award should be "based on the prevailing market rate." In the absence of contrary authority, we decline to depart from *Balkind*.

¶ 119 Defendant argues that the trial court failed to hold a hearing on reasonableness and did not provide adequate findings. But defendant withdrew his request for a hearing. And we reject defendant's argument that the court simply rubber stamped the Attorney General's motion.

¶ 120 Defendant mistakenly relies on cases where separate findings are required to satisfy statutory elements, such as in section 13–17–101, C.R.S.2013. But here, the trial court's findings, although limited, adequately explained the basis for its award. *See Weston v. T & T, LLC*, 271 P.3d 552, 561 (Colo. App.2011) ("The trial court must make sufficient findings, so that, when they are considered together with the record, the reviewing court can conduct a meaningful review.").

## XII. Remaining Issues

¶ 121 Defendant's remaining contentions all challenge the trial court's discretion in admitting evidence or its rulings based on the evidence admitted. But unlike admissibility of the affidavits, discussed in Part V above, the Attorney General urges us not to reach any of these issues because defendant failed to designate a transcript. We agree.

¶ 122 Defendant's contention that the trial court erred by admitting his prelawsuit interview is illustrative. Before trial, the court told him that the interview would be "subject to objection at the time of its entry at trial":

> If the State intends to utilize those statements as a[n] impeachment process, it is certainly not only relevant but admissible. If they intend to introduce it in their case in chief under some other form of evidentiary consideration, absent the Defendant testifying, at this point it's hearsay, and they have to find the exception that fits the rule to allow it to be admitted into evidence. So it is subject again to every evidentiary consideration.

¶ 123 Although the Attorney General concedes that a portion of the interview was admitted, without a transcript we cannot discern: the ground on which the interview was offered; whether defendant objected; if so, on what basis or bases; and the court's rationale for admission. Further, in denying defendant's post-trial motions, the trial court said that it had "previously ruled on the admissibility of evidence after consideration of Defendants' objections." And it concluded that defendant did not "present a sufficient reason for the Court to reconsider its rulings." Hence, we cannot determine whether the court abused its discretion.

¶ 124 Nor can we review the following issues, as framed by defendant, without a complete trial transcript:

- "The State *presented no evidence* that [defendant] violated the federal [Truth in Lending Act] and thus the CCPA does not apply to [him]."

- "The Trial Court erred when it entered a restitution award that is impermissible as a matter of law *under the evidence presented at trial.*"

- "The Trial Court erred when it admitted summary exhibits and newspaper exhibits that *lacked sufficient foundation* and were inadmissible."

- "The scope of the trial court's injunction is improper and excessive and *goes beyond the evidence presented* under the CCPA."

(Emphasis added.)

¶ 125 Accordingly, we decline to address any of these issues. *See Northstar Project Mgmt.*, ¶¶ 11–16.

## CROSS-APPEAL

### XIII. Background

¶ 126 In considering Shifrin's motion for a directed verdict, the trial court said that it had "look[ed] at the evidence in the light most favorable of the moving party." Citing *Hoang v. Arbess*, 80 P.3d 863 (Colo.App. 2003), the court concluded that Shifrin's involvement in the deceptive trade practices had not been proven. ("[Shifrin] retired and whatever Leo Shifrin and the rest of the companies that he was involved in were doing, he could have had some say, but nobody has shown it to me. He probably didn't even know about it.")

¶ 127 Before trial, significant discovery disputes had arisen between Shifrin and the Attorney General. After the trial court adopted a ruling by the discovery master compelling Shifrin and others to respond to written discovery, he refused to answer several interrogatories or produce any documents on the basis of the privilege against self-incrimination. The Attorney General noticed Shifrin for a deposition, several postponements occurred, and eventually, he failed to appear.

¶ 128 The Attorney General moved for discovery sanctions, including entry of default judgment or, alternatively, deeming the complaint allegations admitted and precluding Shifrin from offering any evidence. The court did not rule on this motion before trial, and characterized it on the morning of trial as "a post-trial issue." The court also declined to consider Shifrin's possible discovery violations in granting the motion for a directed verdict. After trial, the Attorney General did not request that the court take up the sanctions motion.

## XIV. The Directed Verdict Ruling

¶ 129 The Attorney General first contends the trial court erred in granting Shifrin's directed verdict motion because it applied the wrong legal standard. We agree, but conclude that on remand the court must consider the motion under C.R.C.P. 41.

### A. Standard of Review

¶ 130 The Attorney General preserved this issue by opposing Shifrin's motion for a directed verdict. We review whether the trial court applied the correct legal standard de novo. *See Freedom Colo. Info., Inc. v. El Paso Cnty. Sheriff's Dep't,* 196 P.3d 892, 897–98 (Colo.2008).

### B. Law

¶ 131 The Attorney General relies on cases applying a directed verdict standard— the evidence must be viewed "in the light most favorable to the plaintiff," *see, e.g., Frontier Exploration, Inc. v. Am. Nat'l Fire Ins. Co.,* 849 P.2d 887, 890 (Colo.App.1992) — rather than in the light most favorable to the moving party, as the trial court did here. But neither standard is applicable. Instead, when an action is tried to the court without a jury, a directed verdict motion "is actually a motion to dismiss pursuant to C.R.C.P. 41(b)." *Id.*

¶ 132 The standard for ruling on a C.R.C.P. 41(b) motion is "not whether the evidence, when viewed in the light most favorable to plaintiff, established a prima facie case." *Id.* Rather, it is "whether judgment in favor of defendant is justified on the evidence presented." *Id.* A defendant may move for dismissal at the close of a plaintiff's case under C.R.C.P. 41(b)(1) on the ground that "upon the facts and the law the plaintiff has shown no right to relief."

### C. Application

¶ 133 Here, the trial court did not apply the standard for dismissal under C.R.C.P. 41, nor make any findings under C.R.C.P. 52(a). *See* C.R.C.P. 41(b)(1) ("If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).").

¶ 134 Nevertheless, the Attorney General argues that because it presented sufficient evidence that Shifrin violated the CCPA, we should conclude on appeal that dismissal was inappropriate and remand for completion of the trial. We decline to do so, for the following two reasons.

¶ 135 First, because the trial court is afforded wide discretion in determining whether to grant a motion for dismissal under C.R.C.P. 41(b)(1), its ruling will not be disturbed in the absence of a showing that "the findings and conclusions of the trial court are so manifestly against the weight of evidence as to compel a contrary result." *Am. Guar. & Liab. Ins. Co. v. King,* 97 P.3d 161, 165 (Colo.App.2003) (internal quotation marks omitted).

¶ 136 "If reasonable minds could differ over the inferences and conclusions to be drawn from the evidence at the conclusion of a plaintiff's case, then an appellate court cannot disturb the findings and conclusions of the trial court." *Colo. Coffee Bean, LLC v. Peaberry Coffee Inc.,* 251 P.3d 9, 25 (Colo. App.2010); *see also Skyland Metro. Dist. v. Mountain W. Enter., LLC,* 184 P.3d 106, 115 (Colo.App.2007) (in an appeal of a judgment entered after trial to the court, we defer to the trial court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and are not supported by the record).

¶ 137 Second, the Attorney General points to portions of the record that it designated and which arguably show Shifrin violated the CCPA. But under C.R.C.P. 41(b)(1), the evidence is not viewed in a light most favorable to the nonmoving party. Rather, the question on review is "whether a judgment in favor of the defendant was justified on the plaintiff's evidence." *Teodonno v. Bachman,* 158 Colo. 1, 4, 404 P.2d 284, 285 (1965). Here, we are unable to determine if dismissal would have been inappropriate under C.R.C.P. 41 because the Attorney General only designated a very limited portion of the transcript.

¶ 138 Accordingly, we conclude that a remand is necessary for the court to consider

Shifrin's directed verdict motion as a motion to dismiss under C.R.C.P. 41(b)(1), and make appropriate findings.

## XV. The Motion for Discovery Sanctions

¶ 139 The Attorney General next contends the trial court abused its discretion by failing to sanction Shifrin under C.R.C.P. 37. We first conclude that any error in not addressing the Attorney General's request for evidentiary sanctions was invited. Still, we agree that the trial court should have addressed the Attorney General's request for a default judgment sanction before ruling on Shifrin's motion for a directed verdict, rather than concluding that granting this motion "preempt[ed]" the request. Thus, we remand for the court to do so, before it addresses C.R.C.P. 41(b)(1).

### A. Preservation and Standard of Review

¶ 140 A trial court enjoys broad discretion in choosing discovery sanctions under C.R.C.P. 37. *See Audio–Visual Sys., Inc. v. Hopper*, 762 P.2d 696, 697 (Colo.App.1988).

¶ 141 The Attorney General moved for a default judgment against Shifrin as a discovery sanction. In the alternative, the Attorney General asked the court to "deem, all facts asserted against Shifrin in the complaint as established, prevent Shifrin from asserting his remaining affirmative defenses, and prohibit Shifrin from presenting evidence at trial." The motion also sought attorney fees and costs "caused by Shifrin's failure to appear for his deposition."

¶ 142 Shortly before trial began, the Attorney General advised the trial court that the motion for discovery sanctions was outstanding. The court told the parties that it had "read all the pleadings as they came in," and had treated any "motions to limit evidence ... as motions in limine." However, the court had not addressed the Attorney General's request for evidentiary sanctions. The court then told the parties that "[a]s far as the default and sanctions, *sanctions* is going to be a post-trial issue in this case...." (Emphasis added.) The Attorney General responded, "[t]hat's fine with the State."

¶ 143 When Shifrin moved for a directed verdict, the Attorney General reminded the court of the motion "for sanctions under [C.R.C.P.] 37, asking for default ... because [he] just really ha[sn't] been able to get anything against him." The court acknowledged "the difficulties that the State may have had about obtaining evidence," but observed that "what I'm here is to decide what evidence they did gain, and what did they present to this Court.... [S]tonewalling that happened ... can't come in to my consideration."

¶ 144 After the court entered a directed verdict for Shifrin, the Attorney General sought clarification on his "motion for sanctions and default." The court held that the evidentiary sanctions were moot. It apologized for not ruling on the default sooner, but offered that its "ruling today would probably preempt that."

[37] ¶ 145 Initially, we conclude that the Attorney General invited any error resulting from the trial court's failure to consider the evidentiary sanctions. *See Horton v. Suthers*, 43 P.3d 611, 618 (Colo.2002) ("[A] party may not complain on appeal of an error that he has invited or injected into the case; he must abide by the consequences of his acts." (internal quotation marks omitted)). When the trial court told the parties it would address the discovery sanctions after trial, the Attorney General did not request a ruling on the evidentiary sanctions pretrial. *See Vanderpool v. Loftness*, 2012 COA 115, ¶ 28, 300 P.3d 953. Instead, the Attorney General acquiesced in the trial court's decision. *See Oman v. Morris*, 28 Colo.App. 124, 128, 471 P.2d 430, 432 (1970).

¶ 146 Thus, we address only whether the court abused its discretion in failing to rule on the Attorney General's motion for default judgment before dismissing Shifrin.

### B. Law

¶ 147 Although discovery matters are entrusted to the discretion of the trial court, that discretion may be abused if the court fails to resolve a pending discovery motion before trial and such failure causes prejudice. *See Jerry Parks Equip. Co. v. Se.*

**530**

*Equip. Co., Inc.,* 817 F.2d 340, 342 (5th Cir. 1987); *cf. Kwik Way Stores, Inc. v. Caldwell,* 745 P.2d 672, 678 (Colo.1987) ("[I]t is incumbent on the trial court to set out the factual and legal bases for the imposition of a sanction, specifying, for example, that the disobedient party failed to comply with a motion to compel or failed to appear for a deposition, and also to explicate on the record why it chose the particular sanction imposed.").

### C. Analysis

¶ 148 Here, in opposing Shifrin's directed verdict motion, the Attorney General reminded the court of the request for a default. Yet, the trial court did not make any findings on Shifrin's conduct or whether he had failed to comply with discovery obligations before dismissing Shifrin from the case. Had the court done so, it might have concluded that default was proper. *See Pfantz v. Kmart Corp.,* 85 P.3d 564, 568 (Colo.App.2003) ("[C]ourts may impose the ultimate penalty of a default judgment where a party has: willfully or deliberately disobeyed a discovery rule; engaged in bad faith conduct that is a flagrant disregard or dereliction of discovery obligations; or engaged in culpable conduct which is more than mere inadvertence or simple negligence, but is gross negligence."). Such a ruling would have rendered Shifrin's motion for a directed verdict moot.

¶ 149 Accordingly, we conclude that the trial court abused its discretion in not deciding the default issue before addressing the directed verdict motion. Thus, on remand, before the court reviews whether dismissal of Shifrin is proper under C.R.C.P. 41(b)(1), it must address the Attorney General's request to default Shifrin.

### XVI. Instructions on Remand

¶ 150 If the court finds that a default judgment is the appropriate sanction, it shall be entered against Shifrin, subject to his appeal. If the court finds that default judgment is not warranted, it shall address Shifrin's directed verdict motion as a motion to dismiss under C.R.C. P 41(b)(1). If the court dismisses the claims against Shifrin under this rule, the Attorney General may appeal. If the court denies Shifrin's motion, the court shall resume the trial, with Shifrin to present his evidence.

### XVII. Conclusion

¶ 151 As to the appeal, we reverse on admission of the affidavits, vacate a portion of the damages award, remand for damages to be recalculated without regard to the affidavits, and otherwise affirm. As to the cross-appeal, we remand for the court to rule on the Attorney General's motion for default judgment and, if applicable, to reconsider Shifrin's directed verdict motion as a motion to dismiss under C.R.C.P. 41(b)(1).

JUDGE ROMÁN and JUDGE BOORAS concur.